**WAPLES–PLATTER COMPANIES and Great Western Foods Company**

v.

**GENERAL FOODS CORPORATION and Kraftco Corporation.**

Civ. A. Nos. CA 4–75–112, CA 4–75–113.

United States District Court,
N. D. Texas,
Fort Worth Division.

Oct. 19, 1977.

**556**

William E. Schuyler, Jr., Washington, D. C., A. M. Herman, Fort Worth, Tex., for plaintiffs.

Morgan L. Fitch, Jr., Chicago, Ill., Don C. Plattsmier, Fort Worth, Tex., for Kraftco.

Catherine F. McCarthy, White Plains, N. Y., V. Bryan Medlock, Jr., Dallas, Tex., for General Foods Corp.

## MEMORANDUM OPINION

MAHON, District Judge.

### I.  INTRODUCTION [1]

These are actions for alleged trademark and tradename infringement and other acts of unfair competition arising under the Federal Trademark (Lanham) Act of 1946,[2] as amended, 15 U.S.C. § 1051 *et seq.*, and under the statutes and commonlaw of the State of Texas.  The undisputed jurisdiction of this Court over these controversies is founded on § 39 of the Act, 15 U.S.C. § 1121, and on 28 U.S.C. §§ 1331, 1332, & 1338.

---

1.  This Memorandum Opinion is divided into four sections.  The first section, "Introduction," sets forth the procedural, statutory, and jurisdictional background of these two consolidated causes of action.  It contains all necessary jurisdictional and procedural findings of fact and conclusions of law.  The second part, "Specific Findings of Fact," is intended to include all basic findings of fact. The third section, "Discussion," is intended to include all intermediate and conclusory findings of fact and to set forth the reasoning by which the Court reached them.  The fourth part, "Conclusions," is intended to set forth all necessary conclusory findings of fact and conclusions of law.

The Court intends this Memorandum Opinion to be its complete findings of fact and conclusions of law as required under Rule 52(a) of the Federal Rules of Civil Procedure. To the extent that any basic, intermediate, or conclusory finding of fact, or any conclusion of law, ought to be characterized as of a different nature than the Court has here characterized it, the appellate court shall properly characterize it, despite the section of this Memorandum Opinion in which it may appear.  *McCawley v. Ozeanosun Compania Maritime, S.A.*, 505 F.2d 26, 30 n. 4 (5th Cir. 1974); 9 Wright & Miller, *Federal Practice and Procedure* §§ 2579–2580 (1971 & Supp.1977).

2.  Cited hereinafter as "the Act."

On 15 April 1975, Waples-Platter Companies and Great Western Foods Company[3] filed two complaints, one against Defendant General Foods Corporation[4] and one against Defendant Kraftco Corporation.[5] In particular, each complaint filed by Plaintiff charged the respective Defendant with trademark infringement under § 32(1) of the Act, 15 U.S.C. § 1114(1), with unfair competition under § 43(a) of the Act, 15 U.S.C. § 1125(a), with trademark infringement under 4 Tex.Bus. & Comm.Code Ann. § 16.26, and with trademark infringement, tradename infringement, and unfair competition under the commonlaw of the State of Texas. By Order of 5 February 1976, this Court bifurcated and consolidated the two causes of action for trial only on the issues of liability raised by the two complaints. Determination of the issue of damages was reserved until after the Court has ruled on liability.

On 19 April 1976, these causes of action came on for trial before the Court, sitting without a jury, on issues of liability only. The trial on the issues of liability lasted through 23 April 1976, during which time the parties presented live testimony, numerous designated depositions, and a multitude of exhibits. After both parties closed on 23 April 1976, the Court allowed a continuance so that the parties might obtain a transcript of the trial, designate portions of depositions for the Court's consideration, offer further necessary exhibits and make any objections thereto, and file briefs and proposed findings of fact and conclusions of law. The parties having accomplished these objectives, the Court ordered and heard closing oral argument on the issues raised at trial for three hours on 5 August 1976.[6] By Order of 21 September 1977, the Court has finalized the admission and listing of all exhibits and designated depositions.[7]

3. Waples-Platter Companies is a Texas corporation having its principal place of business at Waples Road, Fort Worth, Texas, in the Fort Worth Division of the Northern District of Texas. Great Western Foods Company is a Texas corporation having its principal place of business at 1734 East Presidio, Fort Worth, Texas, in the Fort Worth Division of the Northern District of Texas. Where necessary to refer to these corporate entities separately, the Court will hereinafter refer to them as "Waples-Platter" and "Great Western," respectively.

Great Western is a wholly owned subsidiary of its parent corporation, Waples-Platter. The two corporations have identical interests in this lawsuit. The Court is of the opinion that, for the purposes of this lawsuit, the two corporations represent one corporate entity, and the Court will accordingly hereinafter refer to them collectively as "Plaintiff."

4. General Foods Corporation, Defendant in cause of action CA 4-75-112, is a Delaware corporation having its principal place of business at 250 North Street, White Plains, New York, and is licensed to do business in the State of Texas. The Court will hereinafter refer to this Defendant as "General Foods."

5. Kraftco Corporation, Defendant in cause of action CA 4-75-113, is a Delaware corporation having its principal place of business at Kraftco Court, Glenview, Illinois, and is licensed to do business in the State of Texas. The Court will hereinafter refer to this Defendant as "Kraftco."

6. In addition to the briefs and documents filed before oral argument, two letter briefs were filed subsequent to oral argument. These letter briefs dealt with two cases raised for the first time at oral argument—*Pure Foods, Inc. v. Minute Maid Corp.*, 214 F.2d 792 (5th Cir. 1954), and *General Foods Corp. v. Borden, Inc.*, No. 76-C-1782 (N.D.Ill., E.D. 17 June 1976—unreported). Defendant General Foods's letter brief of 22 September 1976 was filed 27 September 1976, and Plaintiff's letter brief of 11 October 1976 was filed 26 April 1977, such delay in filing being caused by clerical error on the part of the Court.

7. One item not mentioned in the Court's Order of 22 September 1977 is the transcript of a similar proceeding between HVR Company and General Foods in United States District Court for the Central District of California. This transcript was furnished the Court by counsel for Plaintiff about 1 June 1977. The Court had hoped, in light of the later proceeding, that the parties would be able to settle this action prior to the Court's ruling. Such settlement possibilities have evidently come to naught.

The Court emphasizes that it has in no way considered this transcript in ruling on the merits of the present controversy. This transcript was not introduced into evidence and, therefore, it would be improper for the Court to take it into account in any manner.

By Supplemental Order of 13 October 1977, the Court has corrected discrepancies in the 22 September 1977 Order which were brought to its attention by the parties.

The Court has carefully considered all testimony presented at the 19 April 1976 trial, and all depositions, exhibits, briefs, and oral arguments presented at the time of trial and thereafter. The Court hereby enters this Memorandum Opinion as its findings of fact and conclusions of law as required under Rule 52(a) of the Federal Rules of Civil Procedure.

## II. SPECIFIC FINDINGS OF FACT [8]

### A. Waples-Platter, Great Western, and "Ranch Style"

#### 1. Founding, Development, and Business of Plaintiff

(1) Since it was founded in 1872, Plaintiff Waples-Platter has either by itself or through divisions, been engaged in the grocery business at the wholesale and institutional levels of trade. From time to time, either by itself or through subsidiaries or divisions, it has operated retail grocery stores. PX 65; Tr. 92–94 & 234.

(2) Plaintiff Waples-Platter was incorporated under the laws of the State of Texas in 1891. PX 15.

(3) Since 1913, Waples-Platter has operated a food processing factory in the same location in Fort Worth, Texas. Items manufactured at that factory include beans, blackeye peas, salad dressings, vinegar, preserves, jellies, syrups, spaghetti, rice, and tea. PX 66.

(4) This food processing operation was incorporated in 1956 as Great Western, a wholly-owned subsidiary of Waples-Platter. PX 14.

(5) Plaintiff has marketed a full line of grocery products, including products under its own private labels ("White Swan" and "W–P") in Texas, Oklahoma, New Mexico, Louisiana, and Arkansas. Plaintiff has marketed a limited line of grocery products in other states, principally those states in the southwestern United States, and provides limited items to the United States Government for sale in military exchanges. PX 16–17; Tr. 35, 93, & 236.

#### 2. History and Development of Plaintiff's Use of "Ranch Style"

(6) In 1931, Plaintiff "began the development of a new product that would make use of the pinto bean in a truly distinctive way." After three years of research, the formula for these beans was perfected. Mr. Lloyd McKee, then president of Plaintiff, introduced the developed product to the market in 1934. The formula remains essentially unchanged today. PX 66; Tr. 201.

(7) Plaintiff originally began manufacturing these beans in 1931 under the trademark "Chuck Wagon." Because of a trademark conflict, however, the "Chuck Wagon" trademark was changed to "Ranch Style." PX 66; Tr. 389–390.

(8) Plaintiff wanted a unique label which would be different from that conventionally used in the 1930's. It adopted one with a black background, red and yellow bands at the top and bottom, and the term "Ranch Style" displayed in a distinctive white font with serifs. PX 66.

(9) Since the early 1930's, Plaintiff has continuously processed and canned beans that are sold under the "Ranch Style" trademark. PX 66.

(10) At least since 1953, Plaintiff has been processing and marketing canned spaghetti along with its beans under the trademark "Ranch Style." More recently, Plaintiff has begun to pack and market the following products under its "Ranch Style" mark: blackeye peas (beginning in 1964); navy beans (beginning in 1968); kidney beans (beginning in 1969); pinto beans (beginning in 1969); Spanish rice (beginning in 1971); chili (beginning in 1971); pinto beans with jalapeno (beginning in 1976); blackeye peas with jalapeno (beginning in 1976). PX 224; Tr. 176–178, 197, & 389.

(11) Since they were originated in the 1930's and continuing up until the incorporation of Great Western in 1956, "Ranch Style" products were manufactured and sold by Waples-Platter. Since the incorporation of Great Western in 1956, the

---

8. See note 1, supra.

"Ranch Style" products continue to be sold by Waples-Platter, although they are manufactured by Great Western and sold by Great Western through other channels of trade, including other wholesale grocers and grocery chains. Tr. 34 & 41.

(12) The "Ranch Style" label of Plaintiff has remained substantially unchanged until the present, and, since 1934, virtually all goods sold under the "Ranch Style" trademark have borne the unique black label with red and yellow bands and distinctive white font. There has been no significant consumer-oriented use of the term "Ranch Style" by Plaintiff other than by its distinctive label. PX 66; Tr. 73–79, 84, 208–209, 212–213, & 626.

(13) Plaintiff has used the "Ranch Style" trademark and its accompanying distinctive label almost exclusively on canned goods. PX 209; DX 327; Tr. 73–79.

3. "Ranch Style:" Plaintiff's Trademarks, Plaintiff's Recent Usage, and Its Importance to Plaintiff

(14) On 9 October 1934, Lloyd H. McKee, then president of Plaintiff, obtained Label Registration No. 44,485 pursuant to the copyright laws of the United States, for the use of "Ranch Style" for beans, which he subsequently assigned to Plaintiff. This Label Registration expired on 9 October 1962 and was not immediately renewed. DX 337A–C; Tr. 86.

(15) On 21 February 1950, Plaintiff obtained United States Registration No. 521,081 under Section 2(f) of the Act, 15 U.S.C. § 1052(f), for the use of "Ranch Style," shown in a distinctive font, for: coffee; canned pinto beans cooked with tomatoe puree, beef fat, spices, salt, seasoning, and sugar; and canned spaghetti cooked with puree, spices, sugar, salt, beef fat, and seasoning. This Registration expired on 21 February 1970. DX 19 & 305.

(16) On 9 January 1962, Plaintiff obtained United States Registration No. 726,319 for the use of "Ranch Style," shown in a distinctive font in combination with a logo showing hearts, the words "Husband Pleasin'," and smiling face of a man, for canned

pinto beans. This Registration has become incontestable subject to the terms of Sections 15 and 33(b) of the Act, 15 U.S.C. §§ 1065 & 1115(b). PX 1; DX 307.

(17) Plaintiff obtained United States Registration No. 860,230 on 12 November 1968 for a design having a black background with red and yellow stripes at the top and bottom, for canned beans, spaghetti, blackeye peas, and coffee, claiming first use of the design on 1 September 1933. This Registration has become incontestable subject to the terms of Sections 15 and 33(b) of the Act, 15 U.S.C. §§ 1065 & 1115(b). DX 297.

(18) On 23 March 1971, Plaintiff obtained United States Registration No. 910,457, under Section 2(f) of the Act, 15 U.S.C. § 1052(f), for the term "Ranch Style," in block type, for canned pinto beans, canned beans, canned spaghetti, canned Spanish rice, canned blackeye peas, canned chili, canned navy beans with bacon, and canned red kidney beans. This Registration took the place of Registration No. 521,081, which had expired due to a clerical oversight. PX 2; DX 306.

(19) On 15 July 1939, Plaintiff obtained Texas Registration No. 8946 for the use of "Ranch Style" incorporated on its normal distinctive label. The description of goods or services in connection with which the mark was registered are described as "packaged and canned foods and ingredients of foods, such as coffee, canned pinto beans cooked with tomato puree, beef fat, spices, and canned spaghetti cooked with puree, spices, etc." PX 142.

(20) Plaintiff also holds registrations of the trademark "Ranch Style" in numerous other states, including Arizona. In each instance, where samples of usage of "Ranch Style" were required Plaintiff submitted its usual distinctive black label. PX 284–286 & 309; DX 18 & 401–404.

(21) Because of clerical oversights, Plaintiff has at times used the registration symbol on its ranch style labels for certain goods when technically, there was no United States Registration of "Ranch Style" for

those goods. Defendants also assert, although this Court finds it unnecessary to determine, that Plaintiff has used the registration symbol on its distinctive "Ranch Style" Spanish rice and chili labels when, technically, none of its registrations cover these goods. PX 10 & 11 A–B; DX 297 & 306; Tr. 217–221.

(22) The nature of the products manufactured and sold by Plaintiff under its Ranch Style trademark, as well as the quality of those products, is tightly controlled by Plaintiff. This control is effected by an executive committee; any new product recommended to be marketed under the Ranch Style trademark is carefully considered and tested, including tasting and comparison with competitive products, by this executive committee of Plaintiff. Only products conforming to the highest standards of quality are permitted to be marketed under the "Ranch Style" trademark. Tr. 42–44, 162, 251, & 391–392.

(23) The principal marketing area for "Ranch Style" products is in the states of Texas, Oklahoma, New Mexico, Louisiana, and Arkansas. "Ranch Style" products are also sold extensively throughout the Western United States, and, in limited quantities, to other states and to the United States Government for sale in military exchanges. In all, the marketing area now extends to some 32 states and several foreign countries. All "Ranch Style" products sold throughout all parts of this marketing area utilize the distinctive black label with red and yellow stripes and the distinctive white font. All evidence before this Court indicates that "Ranch Style" products are well known and highly regarded throughout this marketing area. PX 16–17; Tr. 35, 73–79, 84, 93, & 236.

(24) Prior to 1972, Plaintiff had expended substantial sums in advertising its "Ranch Style" products. Since 1972, however, Plaintiff has kept media-type advertising to a minimum. During the years 1970 to 1972, Plaintiff advertised on television, in newspapers, flyers, mailers, and "shelf talkers." Plaintiffs often granted promotional allowances to customers who advertised its product in local newspapers. Plaintiff has also continuously distributed a *Thrifty Fifty Recipe Booklet*, which recommends different recipes for the use of its "Ranch Style" Beans. Plaintiff has almost always used its distinctive Ranch Style label in its advertising. PX 19–52, 62, 209, 217A–G & 284; Tr. 96–97, 174, 186, 239–249, & 283–284.

(25) Despite its drastic reduction in advertising since 1972, the sales volume of "Ranch Style" products has doubled in the four years from 1972 to 1976. All the evidence before this Court indicates that this increased sales volume was due primarily to favorable consumer acceptance and word-of-mouth recommendations. PX 209 & 284; Tr. 239–240 & 283–284.

(26) In the 1960's, Plaintiff changed the label on several of its products from "White Swan" to "Ranch Style" without any change in the product itself. These products included blackeye peas, pinto beans, kidney beans, and navy beans. In each case, the volume of sales multiplied severalfold. All the evidence before this Court indicates that this increased volume was primarily attributable to a high favorable regard of the "Ranch Style" trademark by consumers. PX 224 & 225; Tr. 174–178.

(27) The phrase "Ranch Style" has been prominently displayed on the outside of Plaintiff's factory operation in Fort Worth, Texas, for more than 40 years. Originally, the phrase "Ranch Style" appeared on the water tower of the factory, but more recently, it appears in an illuminated sign on the side of the factory building itself. This sign, bordering a major Fort Worth freeway, can be seen for several miles. In addition, Plaintiff operates a fleet of trucks from coast to coast, all of which prominently display the phrase "Ranch Style." PX 66 & 96A–B; Tr. 142–143, 181–183, 197, 260–261, & 404; Swain Dep. 54–55.

(28) Great Western has, in the past, and still is seriously considering changing its name to "Ranch Style Foods." Tr. 183–184 & 404.

(29) Executives of Plaintiff consider the term "Ranch Style" the most important asset of Plaintiff at the present time, even

more important than the factory itself. Mr. Tom Ryan testified before this Court that when he invested almost a million dollars in the acquisition of stock in Waples-Platter in 1956, he considered the trademark "Ranch Style" one of the most important assets that he was acquiring. Tr. 195, 246–247, & 405.

(30) On numerous occasions, other persons and businesses have used the term "Ranch Style" in connection with a variety of products ranging from beans to bread and soup. Plaintiff has been diligent in notifying each such person brought to their attention to cease and desist using the term "Ranch Style," and it has been almost uniformly successful in getting compliance. Plaintiff has not generally objected to the use by other persons or businesses of the terms "Ranch" or "Ranch House." Defendants pointed out at trial a few instances in which Plaintiff has failed to object to another business's use of the term "Ranch Style." PX 188–207 & 212–214; Tr. 127, 179–180, & 392–403; Barrett Dep. 71; Henson Dep. II 11; Kusche Dep. 63; Scherer Dep. 42.

#### 4. Salad Dressing and Other Products of Plaintiff

(31) Since it opened its food processing factory in Fort Worth, Texas, in 1913, Plaintiff has manufactured a large number of food products, including beans, blackeye peas, chili, salad dressings, vinegar, preserves, jellies, syrups, spaghetti, rice, and tea. PX 66.

(32) Plaintiff has manufactured and marketed a variety of salad dressings. In 1953, Great Western took over the manufacture of a salad dressing begun by its predecessor. In 1957, upon the purchase of new equipment, the manufacture of salad dressing was enlarged. Salad dressing products were packed by Great Western under both the "White Swan" label and the "Western Gold" label. These salad dressing products included a simple salad dressing, a blue cheese dressing, mayonnaise, a Thousand Island dressing, a fruit salad dressing, a French salad dressing, a cole slaw dressing, pure vegetable salad oil, horseradish dressing, and vinegar. "White Swan" salad dressing products were primarily sold to Waples-Platter, but "Western Gold" salad dressing products were sold through other channels of trade. Plaintiffs discontinued the manufacture of salad dressing products in 1957, because it proved to be unprofitable. None of these salad dressing products were sold under the "Ranch Style" trademark or with the distinctive "Ranch Style" label. PX 68–95; Tr. 383–389, 416, & 422–423.

(33) Plaintiff did not use its "Ranch Style" trademark on any of its salad dressing products because of its fear that the perishable nature of the products and any deterioration of the salad dressings would reflect adversely on the high quality standards established for "Ranch Style" products and the corresponding consumer regard for those products. Tr. 406 & 420–421.

### B. Use of the Term "Ranch Style" on Food Products

#### 1. Plaintiff's Effort in Securing Trademark Registration No. 521,081

(34) In the period from 1948 to 1950, Plaintiff was required to engage in an arduous argument with the United States Patent Office in order to obtain its original United States Trademark Registration (No. 521,081). The Examiner rejected Plaintiff's initial application to register the term "Ranch Style" because of the following prior registrations: "Ranch" for canned sugar corn (1920); "Ranch" for a line of canned soups (1940); "Rancho" for canned soups, dehydrated soup mixes, canned alimentary paste products, fruit and vegetable juices, brown bread, canned fruits, canned vegetables, and canned pork-and-beans (1945); and "Dude Ranch" for canned peas (1938). Plaintiff's attorneys argued in response to this initial rejection that there were sufficient overall differences in the marks and goods in question to avoid any confusion in the trade. But the Examiner again rejected Plaintiff's application on the ground that the mark "Ranch Style" resembled the marks "Ranch," "Rancho," and "Dude

Ranch" to such a degree that confusion was likely to result. In reply, Plaintiff again argued that there were sufficient differences in the sound, appearance, and significance of the marks to avoid confusion. The Examiner rejected that application on the ground that the mark "Ranch Style" was descriptive. To this rejection, Plaintiff argued that there were some 38 prior registrations using the words "Ranch," "Rancho," and "Ranchero." In contending that its trademark "Ranch Style" could coexist with all of the 38 prior registrations, Plaintiff's attorneys pointed to Plaintiff's long use of its mark without any evidence of confusion by anyone with a competitive product, and stated:

> The mark has become entirely distinctive of the applicant's goods and the applicant has not found any evidence of prior or concurrent use of the expression "Ranch Style" commercially or otherwise. The expression "Ranch Style" really does not describe any food, since no two ranches cook foods in the same way; and if the expression means anything, it simply suggests a taste as one might expect in foods cooked on a ranch, possibly over an outdoor fire.

But the Examiner again rejected Plaintiff's application on the ground of similarity to the "Ranch" and "Rancho" marks, stating:

> It may be pointed out that the word "Style" is of little or no trademark significance, leaving the word "Ranch" as the dominant and significant part of the mark.

Plaintiff again applied for the "Ranch Style" trademark, however, relying on the "multiplicity of persons [who] have been permitted to register over a long period of years and for similar goods marks that comprise the word RANCH or the word RANCHO with only slight distinguishing features[.]"

> This applicant admits that RANCH STYLE is descriptive of its goods in a more or less suggestive way, but any question of registrability on that score has been obviated by the fact that the mark has come to distinguish applicant's

goods in federal commerce and the application is made under Section 2(f) of the law.

\*   \*   \*   \*   \*   \*

> [I]t will become obvious that the applicant's mark does not so resemble any one of the three cited marks as to be likely when applied to the very particular goods covered by the present application (and elaborately described therein) to cause confusion or mistake or to deceive purchasers.

Plaintiff supported its last argument by submitting a letter from a friendly competitor that owned the "Ranch" registration to the effect that Plaintiff's use of the mark "Ranch Style" would not lead to any confusion with his product. The attorneys for Plaintiffs then stated in an accompanying submission with this letter:

> Applicant has no desire to cancel the "RANCH" registration for canned sugarcorn and then claim an interference with the "RANCHO" registration in which it may be expected that applicant would prevail on priority and the valuable mark "RANCHO" of its friendly competitor and business relator to be invalidated and there appears to be no good reason why the Patent Office should drive the parties into such litigation under all the facts of record.

DX 305.

(35) The prior registrations for the trademarks "Ranch" and Rancho" are presently on the United States Trademark Register and are still in full force and effect. DX 310 & 312.

(36) Plaintiffs obtained United States Registration No. 521,081 on 21 February 1950 under Section 2(f) of the Act, 15 U.S.C. § 1052(f). DX 19 & 305.

(37) Registration No. 521,081 bears on its face a notice stating: "For reason of allowance over Registrations No. 136,981 'RANCH' and No. 481,014 'RANCHO,' see letter of consent in this file." DX 19.

## 2. HVR and Other Recent "Ranch Style" Salad Dressings

(38) As early as 1960, Hidden Valley Ranch Food Products, Inc. [hereinafter

"HVR"], commenced the sale of a "Hidden Valley Ranch" dry dressing mix for salads. This dressing mix was intended to be mixed with buttermilk and mayonnaise to form a salad dressing. DX 318; Henson Dep. 8–11.

(39) Sales of "Hidden Valley Ranch" dry dressing mix for salads began in California and quickly expanded into the remaining Southwestern States, including Texas, and into the Northwestern States. "Hidden Valley Ranch" dry dressing mix has been sold and extensively advertised through the western part of the United States, including Texas, since the late 1960's. DX 224–225; Henson Dep. I 21–23 & 30–31.

(40) HVR was acquired by the Clorox Company in October 1972. The Clorox Company has expanded the sale of "Hidden Valley Ranch" dry salad mix throughout the United States and has widely advertised the mix in national magazines, on network television, and in newspapers. Plaintiff has never complained to HVR or the Clorox Company about its use of "Hidden Valley Ranch" dry salad dressing mix. Tr. 127; Henson Dep. II 11; Scherer Dep. 21, 27–31, & 42.

(41) The T. Marzetti Company [hereinafter "Marzetti"] commenced the distribution of a "Ranch Style" pourable salad dressing under its own label and under the labels of its customers in 1972. Noble Dep. 11–23.

(42) Marzetti's "Ranch Style" salad dressing is different from the products of Defendants in two respects: (1) it is a tomato-based rather than a dairy-based dressing; and (2) it is a ready-mixed pourable salad dressing rather than a dry mix. DX 132.

(43) Marzetti has sold and is selling its "Ranch Style" salad dressing under its own label in Ohio and the immediately surrounding states since 1972. During the period from 1972 to 1975, Marzetti also manufactured the same salad dressing for the Kohl Corporation [hereinafter "Kohl"] under Kohl's own label, but also using the "Ranch Style" designation. Kohl has marketed its "Ranch Style" salad dressing in Wisconsin and Illinois. Beginning in 1974 and contin-

uing up to the present time, Marzetti has also manufactured its "Ranch Style" salad dressing for the Red Owl Stores, Inc. [hereinafter "Red Owl"], under Red Owl's own label, but also using the "Ranch Style" designation. Red Owl has marketed its "Ranch Style" salad dressing in Minnesota and Wisconsin. Finally, from 1972 up to the present, Marzetti has manufactured its "Ranch Style" salad dressing for Giant Foods, Inc. [hereinafter "Giant Food"], under Giant Food's own label but still using the "Ranch Style" designation. Giant Food has marketed its "Ranch Style" salad dressing in the Baltimore, Maryland-Washington, D. C., metropolitan area. Noble Dep. 13–15, 18, 20–21, & 29–30.

(44) Marzetti's "Ranch Style" salad dressing is one of a line of salad dressings made by Marzetti. Noble Dep. 7–8.

(45) In March 1973, Uncle Dan's, Inc. [hereinafter "Uncle Dan's"], commenced the sale of its "Ranch Style" dairy-based dry salad dressing mix. This "Ranch Style" dry salad dressing mix was one of a line of dry salad mixes sold by Uncle Dan's in the northwestern part of the United States. Plaintiff never complained to Uncle Dan's about its "Ranch Style" dry salad mix while it was still on the market. DX 109 & 334; Barrett Dep. 6, 10–12, & 71.

(46) Uncle Dan's discontinued its use of the designation "Ranch Style" in August 1975 after the threat of suit by the Clorox Company. Uncle Dan's has changed its package labeling from "Ranch Style" to "Western Style." It has also inserted the language "Smokey Bacon Flavor" because of the inability of consumers to identity the flavor of the product when it was labeled simply "Ranch Style" or simply "Western Style." Uncle Dan's claims that it changed its package labeling because it could not afford litigation, not because it thought that it would not prevail in a lawsuit with the Clorox Company. DX 115; Barrett Dep. 40–41, 50, & 53.

(47) In March 1975, Schilling Division of McCormick and Company, Inc. [hereinafter "Schilling"], commenced the sale of its

"Ranch Style" dairy-based dry salad dressing and dip mix as one flavor in its "Salads 'n Dips" line of dry salad dressing and dip mixes. Miller Dep. 15.

(48) Schilling's "Ranch Style" dry salad dressing and dip mix has been widely advertised and promoted in the western part of the United States, including Texas, and continues to be sold in this market. Plaintiff has never complained to Schilling about its "Ranch Style" dry salad dressing and dip mix. Schilling feels justified in using the term "Ranch Style" because of Defendants' prior use of the "Ranch Style" on their competitive dry salad dressing mixes. Miller Dep. 18–20, 23–26, 32, 62, & 75–76.

(49) In 1972, Gaymont Laboratories, Inc. [hereinafter "Gaymont"], was marketing a salad dressing under the designation "Ranch Style." After being noticed by Plaintiff of trademark infringement on 4 April 1972, Gaymont discontinued its use of the term "Ranch Style" on its salad dressings. Gaymont contends, however, that it terminated its use of the term "Ranch Style" because of its customer relationship with Plaintiff, and not because of trademark infringement. PX 206–207; Tr. 179–180.

(50) Pet Incorporated [hereinafter "Pet"] marketed a "Ranch Style" dairy-based pourable dressing in two test market areas in Oklahoma in 1975. Because of insufficient customer acceptance, Pet discontinued its "Ranch Style" salad dressing. Its use commenced in June 1975 and was confined to the two cities in Oklahoma for a very short period of time. Block Dep. 5, 7, & 9–11.

(51) In the early 1970's, Lawry's Foods, Inc. [hereinafter "Lawry's"], sold a "California Ranch Style" dairy-based dry salad dressing mix, although there is no evidence as to the extent of Lawry's use or distribution of the mix. Lawry's has been enjoined from all use of the designation "Ranch Style" in connection with salad dressing products since March 1973, because of a suit by HVR. PX 97 & 152; Tr. 474 & 654.

(52) In April 1972, Specialty Brands, Inc., commenced the sale of "Marie's" "Ranch"

dairy-based refrigerated salad dressing, and immediately extended its sales to some 41 states, including Texas. Specialty Brands, Inc., continues to sell "Marie's" "Ranch" salad dressing in its 41 state sales territory as part of its "Marie's" line of refrigerated salad dressings, and another franchisee is selling "Marie's" "Ranch" dressing in the northwestern part of the United States. Plaintiff has never complained to Specialty Brands, Inc., about its "Marie's" "Ranch" refrigerated salad dressing. DX 79 A–C; Schreiber Dep. 6–18, 32, & 42–43.

(53) In the early 1970's, Olde Tyme Foods, Inc. [hereinafter "Olde Tyme"], began marketing a "Ranch Style" dairy-based dry salad dressing mix in Texas. On 1 April 1973, as the result of settlement of a lawsuit brought by HVR in this Court, Olde Tyme was enjoined from the use of the designation "Ranch Style" in connection with its products. After being enjoined, Olde Tyme changed the designation of its salad dressing mix to "Buttermilk Style," without changing the product itself. PX 98 & 218–219.

(54) In 1974, Nalley's Fine Foods, a division of W. R. Grace and Co. [hereinafter "Nalley's"], began the sale of a "Ranch House" dry dairy-based salad dressing mix as one of its line of "Herb Garden" dry salad dressing mixes. Nalley's "Ranch House" dry salad dressing mix has been widely promoted and advertised in the northwestern part of the United States and continues to be sold there. Nalley's considered using "Ranch Style" in the labeling of its products, but decided not to do so in view of Plaintiff's existing registrations and resulting rights in its trademark. Kusche Dep. 15–18, 22–23, 37–38, 44–51 & 102–103.

### 3. Other Products and Recipes

(55) There are at least 39 federal registrations of the term "Ranch," or a form thereof, alone or in combination with another word, for food products. DX 308–310, 312, 315–319, 321, & 344–368.

(56) Plaintiff has noticed a large number of persons and businesses using the term "Ranch Style" on various products to the effect that such use constitutes infringement of Plaintiff's "Ranch Style" registration. Defendants contend that where such uses were terminated as a result of Plaintiff's notice, determination was due primarily because of the cost of defending suit or because of business relationships, and not because of knowing infringement. PX 188–207.

(57) At trial, Defendants introduced more than 30 recipes using the terms "Ranch," "Ranch Style," and "Ranch" in combination with various words and phrases. There are at least 30 cookbooks or the like which contain recipes for dishes which refer in their title to "Ranch," or a form thereof, alone or in combination with another word. DX 237–266; Tr. 323.

### C. Kraftco and "Ranch Style"

1. Activities Prior to Release of the "Ranch Style" Salad Dressing

(58) About 1970, Kraft Foods Division of Defendant Kraftco was developing a line of dry salad dressing mixes under the trademark "Great Beginnings." By May 1973, the product line was extended nationally to include Italian, garlic, Caesar, avocado, blue cheese, and French salad dressings. DX 329–330; Tr. 638; Killinger Dep. 18–21.

(59) In early 1973, Kraftco decided to expand its "Great Beginnings" line to include a dry salad dressing mix to compete with the one sold by HVR. PX 149 & 151; Tr. 640–642.

(60) Kraftco's advertising agency was requested to create a descriptive name for the new product, and several names were considered, including the following: "Country Morning," "Town & Country Dressing," "Country Place Dressing," "Country Spice Dressing," "Farmhouse," "Country Farm," "Country Style," "Country Town," "Farm Fresh," and "Country Fresh." PX 149 & 151; Tr. 640.

(61) In April 1973, Kraftco did not intend to use the term "Ranch Style" as a name or as a description on its new "Great Beginnings" salad dressing mix. PX 100 B.

(62) Before results of searches on alternative names were reported, Kraftco held a group meeting on 11 June 1973, at which evidence was introduced supporting the use of "Great Beginnings" "Ranch Style." Thereafter, Kraftco proceeded with the name "Ranch Style" and developed various flavors in anticipation of marketing. PX 102–103; Tr. 651–652 & 657.

(63) A list of "Ranch" products was prepared by Kraftco's Research Department from which several of Plaintiff's products were deleted by Kraftco's Advertising Manager before it was forwarded to the Law Department. On 6 August 1973, at the request of Kraftco's Law Department, further support for the generic use of "Ranch Style" in view of Plaintiff's products were provided in the form of recipes using similar terms. On 24 August 1973, Kraftco's Advertising Manager confirmed the oral agreement with Kraftco's Law Department for the use of "Ranch Style" on the new salad dressing mix. Kraftco used the term "Ranch Style" only after consultation with its counsel, to determine that it was common or usual name associated with salad dressing products. PX 152, 154, & 251; DX 228; Tr. 377–378, 653, & 713–716.

(64) Kraftco commenced use of the term "Ranch Style" knowing of at least of some of Plaintiff's registrations and use of the term "Ranch Style." Tr. 714.

(65) The only evidence Kraftco had of what the term "ranch style" meant to the consumer of grocery products is obtained in February 1974 report of *Qualitative Investigation of Usage and Attitudes Toward Hidden Valley Ranch Dressing,* in which two focus group interviews in Los Angeles indicated consumer association with "ranch style" included larger quantity, like a dude ranch, or like cowboys. Prior to the project to compete with HVR, even Kraftco's personnel had never heard of the term "ranch style." PX 99; Tr. 341–342, 352, & 738; Beers Dep. 11; Powell Dep. 11; Swain Dep. 80–81.

(66) At the time of Kraftco's decision to use the term "Ranch Style," however, Kraftco knew of the use of the term on at least two other makes of dry salad dressing mix. DX 230 & 232; Tr. 654–656 & 689–690.

(67) It is patent that Kraftco neither attempted to seek registration of the term "Ranch Style" as trademark for its dry salad dressing mix nor ever used the term "Ranch Style" as a trade name.

## 2. "Ranch Style" Salad Dressing

(68) Kraftco's "Ranch Style" dry salad dressing mix is intended to be made into a salad dressing by mixing it with a dairy base, comprising either milk or buttermilk and mayonnaise. While it is primarily intended for use as a salad dressing, the dry salad dressing mix may also be made into a dip, a sauce for meat and vegetables, or a sandwich. PX 110–112, 123; Tr. 480–481.

(69) Kraftco's "Ranch Style" dry salad dressing mix is packaged in an aluminum foil packet which is predominantly white and red, orange, or blue, dependent upon a particular flavor, with picture of the dressing being spooned onto a green tossed salad. The words "Great Beginnings" appear on the packet in the same size and style type as "Ranch Style," and predominate over the latter by virtue of being black letters on a white background. Other than the use of the words "Ranch Style," Kraftco's packet bears no resemblance to Plaintiff's distinctive Ranch Style label. Moreover, the design of Kraftco's packet was created wholly independently by Kraftco without any intent to mimic or imitate Plaintiff's Ranch Style labeling. PX 110–112; DX 327; Tr. 658–660.

(70) Kraftco's "Ranch Style" dry salad dressing mix was directly competitive with HVR's dry salad dressing mix and was sold through the same channels of trade into the same markets and put in the same section of the retail grocery stores. Tr. 482–484.

(71) In November 1974, Kraftco began the sale of "Ranch Style" salad dressing products in a limited number of test markets throughout the country to ascertain consumer acceptance. These test markets were: Los Angeles, California; Buena Park, California; San Diego, California; Houston, Texas; Chicago, Illinois; Oak Brook, Illinois; Cincinnati, Ohio; Cleveland, Ohio; Philadelphia, Pennsylvania; Miami, Florida; Tampa, Florida; Jacksonville, Florida. PX 163; DX 147 & 163.

(72) Kraftco extensively advertised and promoted its "Ranch Style" salad dressing products in its test markets with advertising on television, in newspapers, and through its sales force. PX 147, 163, 171–172, & 174.

(73) In June 1975, Kraftco decided to terminate its sales of its "Ranch Style" salad dressing products and immediately began disposing of them. All sales or distribution of these products were terminated by Kraftco by November 1975. PX 178; Tr. 670–671.

## 3. Plaintiff's Attempts to Stop Distribution of the "Ranch Style" Products

(74) Plaintiff invited a salesman of Kraftco to make a presentation of its "Great Beginnings" "Ranch Style" dry salad dressing mix prior to its introduction. At that presentation, no objection was raised by Plaintiff with respect to Kraftco's use of the term "Ranch Style." Malone Dep. 17–19; Powell Dep. 75–80.

(75) On 4 November 1974, however, before there was any advertising by Kraftco of its "Ranch Style" dry salad dressing mix, John Ryan, President of Great Western, wrote a letter to J. M. Richmond, Vice President and General Counsel of Kraftco, asking Kraftco to cease and desist its use of the term "Ranch Style." PX 104 A.

(76) Kraftco requested and received on 14 November 1974 a trademark report on "Ranch" which showed no "Ranch Style" federal trademark registration for any food products except those of Plaintiff. Reference to a trade directory (SANI) showed listings of Plaintiff's "Ranch Style" products and other "Ranch" products, but no other specific "Ranch Style" products. Minutes of a Kraftco Operating Staff Meet-

ing on 25 November 1974 indicate that the decision was made at that time to continue using the term "Ranch Style" despite Plaintiff's challenge. After attempts to resolve the controversy between Plaintiff and Kraftco, Kraftco's decision to proceed with its plans to market its "Ranch Style" dry salad dressing mix was communicated to Plaintiff by letter dated 26 February 1975, indicating that Kraftco's position was reinforced by the appearance in the market of General Foods's "Ranch Style" dry salad dressing mix. PX 53, 105, 168, & 170; Tr. 189–192.

### 4. Action by HVR

(77) Kraftco was charged with trademark infringement by the Clorox Company (under United States Registration No. 970,-278 for "Ranch" for dry salad dressing mixes) because of the same use by Kraftco of "Ranch Style" on its dry salad dressing mix as is complained of in this action by Plaintiff. Beers Dep.

### 5. Other Products

(78) Kraftco sells various canned bean products including dark red kidney beans, Boston baked beans, kidney bean salad, and three-bean salad. These bean products are not of the kind primarily sold by Plaintiff, and all sales by Kraftco of these bean products are in the food service or institutional trade under labels and trademarks that are distinctively different from Plaintiff's "Ranch Style" label and trademark. There is no evidence that Kraftco has ever considered the use of the term "Ranch Style" on any bean products or on any other food product except its Great Beginnings salad dressing products. PX 3 A–E, 117, & 120–122; Tr. 60 & 765; Swain Dep. 24–26 & 31.

### D. General Foods and "Ranch Style"

### 1. Activities Prior to Release of "Ranch Style" Salad Dressing

(79) General Foods is a major competitor in the field of dry salad dressing mixes, having marketed dry salad dressing mixes for about 20 years. It now sells its dry salad dressing mixes primarily under the trademark "Good Seasons," and presently markets the following flavors: onion, garlic, cheese garlic, Italian, mild Italian, cheese Italian, Rivera French, Old Fashion French, bleu cheese, low calorie Italian "Thick and Creamy" Thousand Island, "Thick and Creamy" bleu cheese, "Thick and Creamy" Italian, Italian with cheese and croutons, Caesar with croutons, and French style. DX 267; Tr. 458–460.

(80) General Foods first became aware of HVR's dry salad mix in July 1970. By the middle of 1972, General Foods had observed that the HVR mix was beginning to gain substantial inroads in the market-place. DX 289; Tr. 464–465, 474, & 503.

(81) General Foods arranged for a study on "Hidden Valley Buttermilk Group Sessions," which was recorded in November 1971. This report indicated the results of two group sessions conducted in Los Angeles, California, with users of Uncle Dan's or HVR dry salad dressing mixes and concluded that General Foods should attempt to duplicate HVR in view of its wide acceptance in the market-place. PX 182.

(82) Sometime between 1971 and the middle of 1974, General Foods firmly decided to enter the market with a product competitive to that of HVR. PX 263; DX 400; Tr. 466–467 & 547.

(83) During the development of this new competitive product, General Foods received three trademark search reports: one for "Ranch/Ranch House" for salad dressing and salad dressing mixes on 26 May 1972; one for "Ranch Style" for salad dressing on 1 February 1973; and one for "Ranch Style" on 23 August 1974. The only federal registration for "Ranch Style" in the food class reported in any of these searches were those belonging to Plaintiff. DX 283, 286 & 288.

(84) In June 1972, General Foods's advertising agency recommended that the new salad dressing mix be named either "Good Seasons" "Sour Cream" salad dressing mix or "Good Seasons" "Buttermilk" salad dressing mix, with alternative suggestions of Western/California type names like

"Malibu" or "Sausalito." The agency felt that HVR had preempted the terms "Ranch" and "Ranch Style," and that these were viewed by the woman purchaser as a brand name with no specific meaning as to type of product. Nevertheless, General Foods ignored its advertising agency's advice when, on 22 June 1972, a proposal was made for a home-use test of "Good Seasons" "Ranch Style" salad dressing mix against the HVR product on the West Coast. Throughout the research reports and recommendations during the development of "Good Seasons" "Ranch Style" dry salad dressing mix, the product was referred to interchangeably as "Ranch," "Ranch Style," or "Buttermilk." PX 127, 131–133, & 183; Tr. 544.

(85) In February 1973, General Foods's advertising agency performed its own exploratory research of consumer reaction to "Good Seasons" "Ranch Style" and HVR dry salad dressing mixes. The agency found that the meaning of the term "ranch style" to the potential women purchasers of the products involved expectations of a dressing appropriate for beef, barbecues, and outdoor cooking, and a dressing that would be red or brown in color. The advertising agency found that the combination of "Ranch Style" and buttermilk affected some potential purchasers as similar to mixing catsup with milk. General Foods's Associate Product Manager of the "Good Seasons" product line explained that the reason "Ranch Style" had no real meaning to the consumers interviewed in the February 1973 research project was that they had never been exposed to the competitive product of HVR and had never seen the term "ranch style" on a salad dressing. PX 129; Tr. 545.

(86) Despite the reiterated opinion of General Foods's advertising agency on 5 August 1974 that there was no broad awareness of "ranch style" salad dressing and that "Ranch" was seen as a brand name instead of a flavor, General Foods assumed that "Ranch" was the established category and determined to use a "Ranch"-named product so as to reach the consumers who were already using HVR's product. PX 233; Tr. 477–478 & 579.

(87) By September 1974, General Foods's counsel had approved use of the term "Ranch Style" and had indicated that such use did not violate HVR's trademark because "Ranch Style" was the same generic designation of flavor used by other competitors. They recommended that the term "Ranch Style" always be used when salad dressing was referred to, in order to minimize the risk of trademark infringement. PX 238 & 263; Tr. 478–479.

(88) From all the evidence before this Court, it appears that General Foods's decision to use the term "Ranch Style" as a generic flavor designation was contrary to all the research available to them. Their research indicated a lack of any specific meaning for the term "Ranch Style" to the consumer. General Foods did, however, know of at least three other "Ranch Style" dry salad dressing mixes on the market when it first marketed its "Good Seasons" "Ranch Style" dry salad dressing mix. PX 129; Tr. 555–556 & 671.

2. "Ranch Style" Salad Dressing

(89) General Foods's "Ranch Style" dry salad dressing mix is intended to be made into a salad dressing by mixing it with a dairy base, comprising either milk or buttermilk and mayonnaise. While it is primarily intended to be used as a salad dressing, the package mentions that the dressing can also be used with baked potatoes, hamburgers, vegetables, and sandwiches, or as a dip for chips, raw vegetables, or crackers, if sour cream is used in place of buttermilk. PX 123; Tr. 480–481.

(90) General Foods's "Good Seasons" "Ranch Style" dry salad dressing mix is marketed in an aluminum foil twin-pack package, which can be separated into two individual packets by the user. The package is predominantly white and green, containing the words "Ranch Style" as the dominant words or design on the package. The package also contains, though in a much less conspicuous position, the "Good Seasons" trademark. The package displays

the salad dressing being spooned onto a green salad. The design of this package is totally unlike the design of Plaintiff's distinctive "Ranch Style" label, which is basically black with red and yellow stripes. The words "Ranch Style" on General Foods's package appear in green in an old-fashioned, modified block-type font (which General Foods describes as a "conventional Gothic style"), which is very similar to HVR's packaging but different from the distinctive white font used by Plaintiff on its "Ranch Style" label. Nevertheless, the Court finds that the two labels (General Foods's and Plaintiff's) would not be immediately noticeably different to the typical consumer, especially in light of the fact that they are not normally marketed side-by-side. PX 3 A–13 & 123; DX 284; Tr. 477 & 479–481.

(91) In March 1975, General Foods began distribution and sale of its "Ranch Style" dry salad dressing mix in interstate commerce, including sales in Texas. General Foods currently markets this product nationally except in New England and the Mid-Atlantic States. DX 293; Tr. 477 & 581.

(92) General Foods's "Ranch Style" dry salad mix is directly competitive with that of HVR, and is sold through the same channels of trade into the same markets and in the same section of the retail grocery stores. Tr. 482–484.

(93) It is patent that General Foods never considered nor attempted to seek registration of the term "Ranch Style" as a trademark for its dry salad dressing mix; neither has General Foods ever used the term "Ranch Style" as a tradename.

### 3. Plaintiff's Attempts to Stop Distribution of the "Ranch Style" Product

(94) When General Foods first presented its "Good Seasons" "Ranch Style" dry salad dressing mix, to officials of Plaintiff, there was no showing of an immediate complaint. Malone Dep. 15–16.

(95) Nevertheless, shortly after introduction of the "Ranch Style" salad dressing mix, an executive of Plaintiff met with an executive of General Foods during a convention in Chicago of the National American Wholesale Grocers Association to call to the attention of General Foods that Plaintiff owned the federal registrations of the trademark "Ranch Style." After consulting with its lawyers, General Foods decided to continue use of the term "Ranch Style" because there were a number of other violations, and this decision was communicated to Plaintiff. Tr. 55–57.

### 4. Action by HVR

(96) On 22 May 1975, General Foods was sued for trademark infringement by the Clorox Company in the United States District Court for the Southern District of California on the basis of HVR's Registration No. 970,278 for "Ranch" for salad dressing mixes because of the same use of "Ranch Style" by General Foods on its dry salad dressing mix as is complained of in this action by Plaintiff. PX 215.

### 5. Other Products

(97) General Foods, in addition to its Good Seasons line of dry salad dressing mixes, also manufactures and markets a line of canned vegetables. There is no evidence before this Court, however, that General Foods has ever used or considered the use of the term "Ranch Style" on any food product other than its one dry salad dressing mix, or that it has ever used a label similar to Plaintiff's Ranch Style label on any canned food product. Sharoff Dep. 5–7.

### E. Conflict and Confusion

### 1. Distribution and Users

(98) Plaintiff and both Defendants all market their products through the same channels of distribution to the shelves of the same retail grocery stores, both chains and independents, and ultimately to the same type and category of consumer. In furtherance of their marketing and sales, all parties have advertised in the same media, including television and print, and generally approached the ultimate consumer

with the same type of advertising. PX 58, 60–61, & 217 A–G; Tr. 60–61, 96–97, 164–173, 668, & 745–750.

### 2. Plaintiff's Survey Evidence

(99) At trial, Plaintiffs presented a survey gathered by Staples & Stoff, Inc., a marketing research firm headquartered in Houston, Texas. The survey was conducted by two interviewers each at approximately four each shopping centers in Houston, San Antonio, and Dallas-Fort Worth, Texas. The survey represents a total of 296 interviews with women chosen randomly at shopping centers that were located in the different geographical sections of the three urban areas. The age, racial, and residential breakdown of the interviewees indicate that the sample is generally representative of women who live in urban Texas cities. The interviewers, after giving the general statistical background of the interviewees, asked the following two questions:

[1] When you think of the words, *"RANCH STYLE"*, what do you think of? What comes to your mind when you hear the words, *"RANCH STYLE"*?

[2] What food products, if any, do you think of when you hear the words, *"RANCH STYLE"*? What other food products, if any, do you think of when you hear the words, *"RANCH STYLE"*?

(100) The answer "beans" prevailed in both instances. With regard to the first question, "beans" garnered 47% of the answers, winning out over such other commodities and ideas as "homes," "houses," "ranches," "western wear," "clothes," "horses," "cattle," "rodeos," "cowboys," "cook-outs," "western living," "fresh air," "western-style," "country style," "Texas style," "square dancing," "barbecue," "smoked meat," "furniture," "hickory-smoked food," and "drinking beer." The answer "salad dressing" or "salad oil" finished in 14th place, garnishing only 2% of

the total answers. With regard to the second question, which was limited to food products, the answer "beans" was again first, this time garnishing 79% of the total answers. The answer "salad dressing" was 4th, with only 8% of the total answers given, behind those "bacon" or "sausage" and "barbecue" or "smoked meat." The answer "salad oil" gathered an additional 1% of the total answers. The other answers garnishing at least 1% of the total number of answers were: "cook-outs," "ranch style restaurants," "beef," "food," "hickory-smoked food," "steak," and "vegetables." PX 18 Tr. 304–313.

(101) It is patent that this survey does not go directly to the conclusory fact finding of consumer confusion. The designer of the survey admitted at trial that it was not designed to directly measure confusion. And, the Court notes that it could have been designed to more specifically match the issues in this lawsuit.[9] Where the interviewees have answered "beans," this Court has no direct way of knowing whether they were thinking of Plaintiff's product or some generic use of the term "Ranch Style," such as a type of recipe. Nevertheless, the Court finds this survey to be an excellent aid in determining descriptiveness and useful, in an indirect way, in determining the likelihood of confusion. PX 18; Tr. 321.

### 3. Style of Packaging

(102) Since 1934, the unique "Ranch Style" label of Plaintiff has remained substantially unchanged, and Plaintiff has consistently used it on all its "Ranch Style" products. The only "Ranch Style" products ever marketed by Plaintiff have been canned food products. PX 3 A–G, 66, & 209; DX 327; Tr. 73–79, 84, 88, 208–209, 212–213, & 626.

(103) All of Defendants' "Ranch Style" products are dry salad dressing mixes, con-

---

**9.** For example, the survey could have asked whether the interviewees considered the term "Ranch Style" to be a descriptive term or a brand name with regard to a list of products that would have included both beans and salad dressing.

*See* the survey introduced in *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 278 (7th Cir. 1976).

tained in aluminum foil packets, with brightly colored, light, labels with large photographs of salad dressing being spooned onto a tossed green salad. On Kraftco's "Ranch Style" products, the term "Ranch Style," while portrayed in bold capital letters, appears in a severe block type subordinate to the term "Great Beginnings." On General Foods's "Ranch Style" dry salad mix, the words "Ranch Style" predominate, appearing far larger than any other printing, and far overshadowing the "Good Seasons" trademark.

### 4. Shelving and Displaying

(104) From the vague evidence before the Court, it appears that Plaintiff's "Ranch Style" goods are usually displayed in and sold to the public from the canned goods or prepared foods sections of the grocery store. Defendants' "Ranch Style" dry salad dressing mixes are primarily stocked in and sold to the public from the salad dressing section of the grocery store, which is usually spaced away from the canned goods or prepared foods sections of most grocery stores. General Foods gives specific instructions to its sales personnel as to where the "Good Seasons" "Ranch Style" carton should be displayed in a grocery store ; namely, between the other "Good Seasons" dry salad dressing mixes and competitive salad dressing mixes such as that of HVR. "Good Seasons" "Ranch Style" dry salad dressing mix is normally sold in a side-by-side relationship with competitive dry salad dressing mixes such as that of HVR. Nevertheless, dry salad dressing mix racks are occasionally placed in the same aisle with Plaintiff's "Ranch Style" products, and Kraftco urged that its "shelf extender" for "Great Beginnings" "Ranch Style" dry salad dressing mix be used wherever there is a price rail or tie-in opportunity, including the canned vegetable department. PX 147 & 253–257; DX 295; Tr. 89–90, 154, 228–229, 232–233, & 482–484.

### 5. Dip

(105) "Ranch Style" salad dressing products made with either of Defendants' dry dressing mixes are primarily intended for use as a salad dressing, but are also recommended on the package for use as a dip. Great Western has been seriously developing a dip to be marketed under their "Ranch Style" trademark. PX 110–112 & 123; Tr. 179 & 480–481.

### 6. Actual Confusion

(106) Evidence of actual confusion between the Plaintiff's "Ranch Style" products and the "Ranch Style" dry salad dressing mixes of Defendants is minimal. The Court does find, however, at least two significant instances of confusion on the part of professional grocers. PX 139 C; Tr. 129, 274, 431, & 627.

### 7. Likelihood of Confusion

(107) Defendants submitted a number of depositions containing self-serving statements from officers of other businesses selling similar products to the effect that they could see no likelihood of confusion between their products or Defendants' products, and the Ranch Style products of Plaintiff. The Court finds these to be of little evidentiary value. Barrett Dep. 40–42 & 71; Block Dep. 17; Kusche Dep. 62–63; Lucas Dep. 14; Miller Dep. 31–33; Noble Dep. 42–43; Schreiber Dep. 31–32.

### 8. Passing Off

(108) The Court has been shown no evidence of any attempt on the part of either Defendant to intentionally "pass off" their "Ranch Style" dry salad dressing mixes as being products of Plaintiff's. Tr. 672.

### F. Descriptiveness of the Term "Ranch Style"

(109) In an official letter, the Food and Drug Administration of the United States stated that the term "Ranch Style" is not descriptive of any food product. PX 63.

(110) Defendants submitted the depositions of officials of two other businesses using the term "Ranch Style" on a dry salad dressing mix, which contained self-serving statements that the term "Ranch Style" designated a flavor of salad dressing.

The Court finds these statements to be of little evidentiary value. Block Dep. 7 & 18; Schreiber Dep. 21.

(111) Defendants also submitted the deposition of an official of Marzetti, which contained the self-serving statement that the term "Ranch Style" does not identify a particular origin of a salad dressing, but instead describes the flavor of the Marzetti "Ranch Style" salad dressing, because it is a "good common romantic outdoorsy name to associate with a red, sweet type of dressing that could be used on salads, but also could be used for outdoor barbecuing." Noble Dep. 22–23, 27, & 42.

(112) It is not uncommon in the food industry that a work or term will be descriptive of one type of food product, but totally lack descriptiveness when applied to another type of food product. Nor is it uncommon in the food industry for a word or term to be a trademark for one type of food product and to be descriptive of another type. DX 370–375 A; Tr. 327–331.

## III. DISCUSSION [10]

These actions differ from the typical trademark infringement suit in that they necessarily involve a third-person, HVR, with yet a different mark, "Hidden Valley Ranch." Defendants were apparently attempting to compete with HVR when they adopted the use of the term "Ranch Style," which allegedly infringes on Plaintiff's mark. Thus, while the question of possible infringement by Defendants on HVR's mark is not before the Court, many of the factual conclusions underlying that question must be resolved in the determination of the present controversy. The Court will have to consider the non-party HVR, its use of its mark, the distribution and sales of its products, and its competitors, including Defendants.

An additional deviation from the traditional infringement case is presented by the fact that Plaintiff manufactures a line of food products under the mark "Ranch Style," part of which are described by the mark and part of which are not.

### A. Trademark Infringement

The basic thrust of Plaintiff's claims for relief is trademark infringement under the Act, as amended, 15 U.S.C. § 1114, which provides in pertinent part:

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive   .   .   .

\*     \*     \*     \*     \*     \*

shall be liable in a civil action by the registrant   .   .   .   .

■ As is apparent from the face of the statute, the essential finding in any action under 15 U.S.C. § 1114(1)(a) is the likelihood of confusion to the consumer, which is a fact issue. *Kentucky Fried Chicken Corp. v. Diversified Pkg. Corp.*, 549 F.2d 368, 386 (5th Cir. 1977); *Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44 (5th Cir. 1975); *Volkswagenwerk Aktiengesellschaft v. Rickard*, 492 F.2d 474, 477–478 (5th Cir. 1974); *Beef/Eater Restaurants, Inc. v. James Burrough Ltd.*, 398 F.2d 637, 639 (5th Cir. 1968); *American Foods, Inc. v. Golden Flake, Inc.*, 312 F.2d 619, 623–624 (5th Cir. 1963); *Pure Foods, Inc. v. Minute Maid Corp.*, 214 F.2d 792, 796–797 (5th Cir. 1954); *James Burrough, Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266 (7th Cir. 1976); *E. I. Dupont de Nemours and Co. v. Yoshida Int'l, Inc.*, 393 F.Supp. 502, 509–510 (E.D.N.Y.1975).

The reason for requiring this factual finding rests in the nature of the tort of trademark infringement, itself.

.   .   .   The law of trade-marks is but a part of the broader law of unfair competition; the right to a particular mark grows out of its use, not its mere adoption; its function is simply to desig-

---

10.  See note 1, *supra*.

nate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; and it is not the subject of property except in connection with an existing business.

The owner of a trade-mark may not, like the proprietor of a patented invention, make a negative and merely prohibitive use of it as a monopoly.

In truth, a trade-mark confers no monopoly whatever in a proper sense, but is merely a convenient means for facilitating the protection of one's good-will in trade by placing a distinguishing mark or symbol—a commercial signature—upon the merchandise or the package in which it is sold

\*  \*  \*  \*  \*  \*

. . . [T]he newcomer . . . must enter [the market] subject to whatever rights had previously been acquired there in good faith by the . . . predecessor. To hold otherwise . . . would be to establish the right of the latter as a right in gross, and to extend it to a territory wholly remote from the furthest reach of the trade to which it was annexed . . . . .

*United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97–101, 39 S.Ct. 48, 50–51, 52, 63 L.Ed. 141 (1918) (citations omitted).

▉ Thus, trademark infringement must be determined from the consumer's viewpoint, since all rights that a user has in a trademark stem from the public's acceptance of the mark. Indeed, this consumer-viewpoint rule has even been stated as a public interest in not being misled by confusingly similar marks. *Scarves By Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1172 (2d Cir. 1976).

▉ Since the rights of the user in his mark correspond to the good will created in the consuming public, the relevant consumer recognition to be protected is that of the origin of the quality of goods, not necessarily of the actual manufacture of the goods.

The fact that [Plaintiffs] were not the actual manufacturers of the [product] upon which they had for years placed the brand in question does not deprive them of the right to be protected in the use of that brand as a trade-mark.

They used the words . . . to designate [the product] selected by them in the exercise of their best judgment, as equal to a certain standard. The brand did not indicate by whom the [product] was manufactured, but it did indicate the origin of its selection and classification. It was equivalent to the signature of [Plaintiffs] to a certificate that the [product] was the genuine article which had been determined by them to possess a certain degree of excellence. It did not, of course, in itself indicate quality, for it was merely a fancy name . . ., but it evidenced that the skill, knowledge and judgment of [Plaintiffs] had been exercised in ascertaining that the particular [product] so marked was possessed of a merit rendered definite by their examination and of a uniformity rendered certain by their selection. . . .

\*  \*  \*  \*  \*  \*

[Plaintiffs], then, having acquired the exclusive right to the [brand], as applied to this particular vendible commodity, it is no answer to their action to say that there was no invasion of that right because the name of [Defendants] accompanied the brand upon [the product] sold by [them], instead of the name of [Plaintiffs]. That is an aggravation, and not a justification, for it is openly trading in the name of another upon the reputation acquired by the device of the true proprietor.

*Menendez v. Holt*, 128 U.S. 514, 520–521, 9 S.Ct. 143, 144, 32 L.Ed. 526 (1888) (citations omitted).

▉ Thus, it has been long-established that the rights a user has in his tradename are the protection of his good reputation and the ability to control the use of his mark so as to maintain and shape the good will that exists in the mark (sometimes stated as the ability to maintain the distinctiveness of his mark). *Scarves By Vera, supra*, 544 F.2d at 1172; *James Burrough,*

*supra*, 540 F.2d at 276; *Chips 'n Twigs, Inc. v. Chip-Chip, Ltd.*, 414 F.Supp. 1003, 1018 (E.D.Pa.1976); *E. I. Dupont de Nemours, supra*, 393 F.Supp. at 521–522. Any unauthorized use of a certain mark which would tend to connote that the prior user had in some way authorized the subsequent use of the mark infringes on the prior user's rights. It is immaterial whether the consumer might think that the prior user was manufacturing the subsequent product, whether it was being produced under the prior user's design or supervision, or whether it was being produced pursuant to some other arrangement with the prior user, so long as the subsequent use of the mark is likely to confuse the consumer and put the prior user's reputation in the marketplace beyond his control. *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 155–156 (9th Cir. 1963). And, since the relevant consideration is the prior user's loss of exclusive control over his mark and his good will, the actual quality of the subsequent user's product is normally immaterial. Even if the subsequent user's product is of a higher quality than that of the prior user, the prior user has lost the exclusive control of his mark and his good will and, if there is a likelihood of confusion, has suffered infringement. *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 122 (9th Cir. 1968); *E. I. Dupont de Nemours, supra*, 393 F.Supp. at 522–523. Similarly, the fact that the prior user may be a small business while the subsequent user may be a large, nation-wide concern, does not militate against the prior user's rights to maintain and control the good will that exists in his mark. *Sheila's Shine Prod., Inc., v. Sheila Shine, Inc.*, 486 F.2d 114, 123 (5th Cir. 1973).

A user's rights in his mark are not necessarily limited to the specific products produced by that user, but extend to any products or marketing area so related to the prior user's products that subsequent use of the mark is likely to confuse consumers and put the prior user's reputation in the market beyond his control. *Kentucky Fried Chicken, supra*, 549 F.2d at 388; *Beef/Eater Restaurants, supra*, 398 F.2d at 639; *American Foods, supra*, 312 F.2d at 623; *Pure Foods, supra*, 214 F.2d at 796–797; *Maier Brewing, supra*, 390 F.2d at 122; *Fleischmann Distilling, supra*, 314 F.2d at 160. Thus, the prior user has a protectable interest in being able to utilize the existing good will in his mark in order to be able to enter a related field at some future time. *Scarves By Vera, supra*, 544 F.2d at 1172.

The plaintiff in a trademark infringement case can take advantage of several presumptions that make his burden of proof easier than that of a plaintiff in an unfair competition case. Prior use of the trademark gives rise to a presumption of exclusive right to it and renders unnecessary proof of actual intent to defraud. Registration under the Act creates a presumption of adoption and continued use, and is prima facie evidence of validity. The plaintiff does, however, bear the traditional burden of proof to establish the factual finding of likelihood of confusion by a preponderance of the evidence. But the burden of coming forward may shift, so that where the allegedly infringing mark is shown to be confusingly similar to the registered mark, and its use began subsequent to registration, the defendant must carry the burden of explanation and persuasion. *American Foods, supra*, 312 F.2d at 624; *Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.*, 411 F.2d 1097, 1101 (2d Cir. 1969); *E. I. Dupont de Nemours, supra*, 393 F.Supp. at 510 & n. 4; *Ye Olde Tavern Cheese Prod., Inc. v. Planters Peanuts Div., Standard Brands, Inc.*, 261 F.Supp. 200, 204–205 (N.D.Ill.1966); 3 Callmann, *Unfair Competition, Trademarks, and Monopolies* § 82.3(e) (3d ed. 1969).

The courts have set forth numerous factors to consider in determining a trademark owner's right to relief where the products are not directly competitive. These include the type, strength, and distinctiveness of trademark at issue, similarity of design, similarity of products, the likelihood that the owner will bridge the gap in the products, identity and proximity of retail outlets, identity of advertising me-

dia used, identity and sophistication of purchasers, the quality of the subsequent user's products, the subsequent user's intent in adopting the mark, and actual confusion. *Roto-Rooter, supra,* 513 F.2d at 45–46; *American Foods, supra,* 312 F.2d at 624–625; *Scarves By Vera, supra,* 544 F.2d at 1173; *Kiki Undies, supra,* 411 F.2d at 1099; *E. I. Dupont de Nemours, supra,* 393 F.Supp. at 510–511. All of these factors, however,

> are variable and relative and no single one, because of its presence or absence, is, in itself, determinative of a case. Rather, the method of approach requires the trial court to consider and weigh the evidence relative to each of these points and such other points as, in the particular circumstances before it, the court finds applicable; then, from a balancing of the conclusions reached on all of these factors, the court decides whether or not the parties are entitled to the relief or protection sought.

*Kiki Undies, supra,* 411 F.2d at 1099.

■ Because of the speculative nature of any effort to weigh the probabilities arising from confusing similarity and the unique set of factors that each case presents, strict general rules and precedents are of little value. There are a few general principles, however, that do transcend the particulars. In weighing the evidence of the likelihood of confusion, the court must strive to place itself in the shoes of the ordinary prospective purchaser, using his ability to discriminate and taking into account his propensity for carelessness. Thus, in addition to the evidence adduced at trial, the trial judge must make his own comparison of the marks. And an overall impression of general similarity is more important than a technical analysis of specific differences or a side-by-side comparison. Finally, where evaluation of all pertinent factors still leaves the matter in doubt, such doubt should be resolved against the subsequent user. *Beef/Eater Restaurants, supra,* 398 F.2d at 639; *American Foods, supra,* 312 F.2d at 624; *James Burrough, supra,* 540 F.2d at 275; *Fleischmann Distilling, supra,* 314 F.2d at 161; *E. I. Dupont de Nemours, supra,* 393 F.Supp. at 510; *Ye Olde Tavern Cheese Prod., supra,* 261 F.Supp. at 205.

Having set forth the general principles of law applicable to this case, the Court will now discuss the various factors relevant to the particular factual situation of this case.

### 1. The Trademark

■ Trademarks are characterized as running from strong to weak. The relative strength of a trademark is but a legal shorthand for the breadth of protection to be afforded the mark, and is based ultimately on the consumers' recognition of the trademark as the hallmark for a particular source of a product or a type of products. *E. I. Dupont de Nemours, supra,* 393 F.Supp. at 512; *Proxite Prod., Inc. v. Bonnie Brite Prod. Corp.,* 206 F.Supp. 511, 515 (S.D.N.Y.1962).

> . . . [T]he phrase "breadth of protection" is but shorthand reference to the more fundamental, and more appropriate consideration. The trademark laws exist not to "protect" trademarks, but, . . . to protect the consuming public from confusion, nonconcomitantly protecting the trademark owner's right to a non-confused public.
>
> Though [Plaintiff's] mark is indeed strong, [Plaintiff] would not prevail if confusion were not likely. Conversely, the owner of a so-called "weak" mark will prevail if confusion be likely. What is intended by references to "strong" and "weak" marks is the effect of such marks upon the mind of the consuming public. A mark that is strong because of its fame or its uniqueness, is more likely to be remembered and more likely to be associated in the public mind with a greater breadth of products or services, than is a mark that is weak because relatively unknown or very like similar marks or very like the name of the product.

*James Burrough, supra,* 540 F.2d at 276.

■ The traditional analysis of the relative strength of a trademark is two-pronged. The first stage is to characterize

the mark as "weak" or "strong," based solely on an investigation of the mark itself. If a mark is "generic" (by virtue of including the proper name of the product or of an essential ingredient), it is clearly weak. Conversely, if a mark is "arbitrary" or "inventive" (by virtue of being completely non-descriptive or by use of a fanciful name), it is clearly strong. Other marks fall into a nebulous middle ground, ranging from "suggestive" (strong) to "descriptive" (weak).

■■■ A trademark is descriptive if it conveys to potential consumers the characteristics, functions, qualities, ingredients, properties, or uses of the product. *Flexitized, Inc. v. National Corp.,* 335 F.2d 774, 779 (2d Cir. 1964); *W. E. Bassett Co. v. Revlon, Inc.,* 435 F.2d 656, 661 (2d Cir. 1970); *Ralston Purina Co. v. Thomas J. Lipton,* 341 F.Supp. 129, 133 (S.D.N.Y.1972). In determining whether a mark is descriptive, the Fifth Circuit, in *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.,* 494 F.2d 3, 11 (5th Cir. 1974), has recommended the use of dictionary definitions and has admonished not to engage in hypertechnical philological analysis, but rather to determine whether a certain mark "is a singularly appropriate word for conveying information with respect to the nature" of the product in question.

Under the second prong of analysis, however, even a trademark that has been classified as descriptive may still be entitled to protection if it has acquired a secondary meaning.

Considered today as a part of the broader law of unfair competition, the doctrine of secondary meaning is another avenue to protection of trade names independent of any trademark act. The doctrine has been accounted as the response of the common law to the realities of business life. Apparently entrepreneurs can not resist the temptation to tie the name of their product to some disabling quality of description, geography, or vanity. While this foible prevents recourse to the Act, in a proper case the law will recognize the years of effort and expense,

necessary to effect a turn of the public mind, with equivalent protection. Once secondary meaning is established, the beneficiary need only show a likelihood of confusion to enjoin an infringing use.

\* \* \* \* \* \*

. . . The doctrine of secondary meaning is primarily concerned with descriptive marks and marks unregistrable for other reasons enumerated in the Act. The determination that [a mark] is descriptive is only effective to prevent recourse to the Act and does not simultaneously foreclose recourse to the doctrine of secondary meaning.

\* \* \* \* \* \*

A claim of secondary meaning presents a question of fact. The chief inquiry is the attitude of the consumer toward the mark; does it denote to him a, "single thing coming from a single source"? Short of a survey, this is difficult of direct proof.

*Aloe Creme Laboratories, Inc. v. Milsan, Inc.,* 423 F.2d 845, 848–849 (5th Cir. 1970) (footnotes omitted). *See also American Heritage Life Ins., supra,* 494 F.2d at 11–12; *W. E. Bassett, supra,* 435 F.2d at 661.

The crux of the secondary meaning doctrine is that the mark comes to identify not only the goods but the source of those goods. To establish secondary meaning, it must be shown that the *primary* significance of the term in the minds of the consuming public is not the product but the producer. This may be an anonymous producer, since consumers often buy goods without knowing the personal identity or actual name of the manufacturer. However, it must be demonstrated that the purchasing public associates goods designated by the particular word or words in question with but a single, though anonymous, source. In other words, the consumer, having acquired confidence in the quality of a particular product through usage, is entitled to protection against imitations marketed by other producers.

Proof of secondary meaning is often difficult. No precise guidelines are applicable and no single factor is determinative. Each case must be decided on its own facts . . . .

*Ralston Purina, supra,* 341 F.Supp. at 133 (citations omitted). *See also Volkswagenwerk, supra,* 492 F.2d at 477–478.

■ Since secondary meaning depends on public acceptance of the trademark in question, it may be established with regard to a certain limited geographic area or to a circumscribed area of the user's business. *Beef/Eater Restaurants, supra,* 398 F.2d at 640; *Jewel Companies, Inc. v. Westhall Co.,* 413 F.Supp. 994, 1001 (N.D.Ohio 1976).

■ Also at issue in the present case is the question of third-person use of the mark. The fact that a mark has been adopted and used by many other producers is a factor indicating that the mark does not signify any particular origin. *Arrow Distilleries, Inc. v. Globe Brewing Co.,* 117 F.2d 347, 349 (4th Cir. 1941). The key consideration is actual use. The mere fact that other persons have registered the mark or variations thereof is not significant to the issue of secondary meaning unless the nature and extent of the third-person use is shown. *Menendez, supra,* 128 U.S. at 521, 9 S.Ct. 143; *W. E. Bassett, supra,* 435 F.2d at 661; *Arrow Distilleries, supra,* 117 F.2d at 351; *Chips 'n Twigs, supra,* 414 F.Supp. at 1017–1018. As with all variables for consideration in determining whether secondary meaning exists, there is no general rule to be slavishly followed. Rather, the importance of third-person use adoption is to be considered on a case-by-case examination of the facts. *Metropolitan Life Ins. Co. v. Metropolitan Ins. Co.,* 277 F.2d 896, 900 (7th Cir. 1960); *Arrow Distilleries, supra,* 117 F.2d at 351.

a. Application to Plaintiff's Products

Plaintiff has obtained several federal registrations for its "Ranch Style" trademark:

(1) No. 44,485 for beans in 1934, which expired in 1962;

(2) No. 521,081 for coffee, canned pinto beans, and canned spaghetti, under 15 U.S.C. § 1052(f) in 1950, which expired in 1970;

(3) No. 726,319 for canned pinto beans in 1962, which has become incontestable under the Act, 15 U.S.C. §§ 1065 & 1115(b); and

(4) No. 910,457 for canned pinto beans, canned beans, canned spaghetti, canned Spanish rice, canned blackeyed peas, canned chili, canned navy beans with bacon, and canned red kidney beans, under 15 U.S.C. § 1052(f) in 1971, taking the place of No. 521,081.

■ These registrations are prima facie evidence of the validity, ownership, and exclusive right of use of Plaintiff's trademark "Ranch Style" with regard to the food products listed in the registrations. 15 U.S.C. §§ 1057(b) & 1115(a); *American Heritage Life Ins., supra,* 494 F.2d at 10. But the food products registered are limited to canned pinto beans in Plaintiff's special sauce and seasonings, canned beans of other types, canned spaghetti, canned rice, and canned chili. Plaintiff now seeks to assert the right to exclusive control and use of its trademark "Ranch Style" against Defendants' use of the term on packets of dry salad dressing mix. Accordingly, the Court must determine the nature of Plaintiff's trademark with regard to packaged food products in general.

Plaintiff has never objected to any third person's use of the word "ranch" or its variations when used without the word "style." Plaintiff, instead, has jealously guarded the entire term "Ranch Style" and considers its trademark to consist of those two words only when used together.

Defendant, on the other hand, urges that the word "style" can add no substantive meaning to another term, and that Plaintiff's mark must therefore be considered along with all the marks of other users that consist of "ranch" or variations thereof.

*Webster's Third New International Dictionary* (1966) [hereinafter "the Dictionary"] defines the noun "ranch" as:

1: an establishment for the grazing and rearing of horses, cattle, or sheep that

usu. includes the buildings occupied by the owner and employees with the adjacent barns and corrals

2: a farm of any size usu. devoted to the raising of one particular specialty

. . . 3: DUDE RANCH.

The same source defines "dude ranch" as a ranch or resort for vacationers offering primarily horseback riding and other activities typical of western ranches;

and lists the following commonly used forms of the word "ranch": "rancher," "ranch house," "ranchland," "ranchman," "ranch mink," and "ranchwoman;" along with the following words derived from Mexican Spanish: "rancheria," "ranchero," and "rancho."

The noun "style" is given a multitude of different definitions in the *Dictionary,* the most relevant of which to the present controversy are:

. . . 3 . . . b: an attributive or qualifying designation . . . 4a: manner or method of acting or performing esp. as recognized or sanctioned by some standard . . . ; *often* : one that is distinctive or characteristic of or attributed to some group or period. . .

Plaintiff's mark must be considered to be somewhat diminished in strength because of its use of the word "style." The word "style" signifies a descriptive phrase, meaning to the reader "characteristic of" or "having the qualities attributed to" whatever the modifying word may be. Thus the term "ranch style" is clearly descriptive in a literal sense. This conclusion, however, does not answer the relevant question regarding the descriptiveness of the term as applied to the relevant grocery items in the mind of the typical consumer.

Having carefully considered the dictionary meaning of the word "ranch," Plaintiff's survey, Defendants' pre-release research projects, and the numerous recipes and cookbooks introduced by Defendants, the Court concludes that there are three descriptive meanings to the term "ranch style" as applied to food products in the mind of the typical consumer:

(1) pinto or kidney beans cooked in a tomato-based sauce with onions and spices;

(2) various meats or meat products which are barbecued or hickory-smoked; and

(3) sauces or dressings for meats or vegetables that are tomato-based and/or red or brown colored and spicy, pungent, or hickory-smoke or onion flavored.

There appear to be no other descriptive meanings for the term "ranch style" as applied to food products.

The second and third descriptive meanings have no application to this lawsuit. The first meaning, however, is directly applicable to Plaintiff's "Ranch Style Beans" product. But the Patent Office, by issuing Registration No. 521,081 under 15 U.S.C. § 1052(f), recognized that, as of 1950, Plaintiff's trademark "Ranch Style" had taken on a secondary meaning. From the time that Registration issued, until it expired in 1970, it was entitled to the same presumptions as any other registration, and serves as prima facie evidence that a secondary meaning existed from 1950 to 1970 in Plaintiff's "Ranch Style" trademark for its "Ranch Style Beans." 15 U.S.C. § 1057(b); *Roto-Rooter, supra,* 513 F.2d at 46–47; *Evelyn Wood Reading Dynamic Institutes v. Zimmerman,* 134 U.S.P.Q. 475 (N.D.Cal.1962). This trademark registration was effectively renewed in 1971 as Registration No. 910,457 for "Ranch Style" for Plaintiff's then entire line of products.

Of more significance to the present case is the fact that Plaintiff uses the mark "Ranch Style" on its entire line of products. Though "Ranch Style Beans" was Plaintiff's first product back in the 1930's, and the product on which its business was founded, Plaintiff shortly thereafter added "Ranch Style Spaghetti" and has, ever since then, been expanding its line of "Ranch Style" products to include numerous different canned bean products, canned rice, and canned chili. With regard to all of Plaintiff's products except "Ranch Style Beans," the term "ranch style" is not descriptive of the product. Indeed, if it were taken as

descriptive of these other products, it would almost constitute false advertising.

The other bean products are not of the type that fit the common descriptive meaning for "ranch style" beans, and the term is clearly not descriptive of spaghetti or rice.

■ The Court finds that the intent and, more importantly, the effect of using the mark "Ranch Style" on these subsequent "non-ranch-style" products was and is to connect them to the original "Ranch Style Beans" so as to correctly create in the mind of the typical consumer the impression that the origin of the later products is the same as that of "Ranch Style Beans."

■ The Court has no basis for finding that Plaintiff's mark has been weakened by third-person use of terms such as "ranch" or "rancho," since Defendant has failed to come forward with any proof of the extent or nature of such third-person marks (other than on salad dressing products), but has merely pointed out current and expired federal registrations. More importantly, the Court finds that the use of the term "style" effectively distinguishes Plaintiff's mark from other marks using other variations of the word "ranch." While the word "style" has no distinguishing significance in itself, and even weakens a mark by reinforcing any descriptiveness inherent in the mark, the Court finds that the typical consumer can distinguish the entire phrase "Ranch Style" from words and phrases such as "Ranch," "Rancho," and "Dude Ranch" when the word "style" is set forth in the same distinctive manner as the word "ranch" and the mark is used successfully by the producer to create the impression that the entire phrase signifies the origin of the product.

■ In sum, as used on all of Plaintiff's products except "Ranch Style Beans," the mark "Ranch Style" is at most only slightly suggestive. When this is coupled with Plaintiff's long-term successful efforts to use the mark so as to correctly create the impression in the mind of the typical consumer that all of its products have the same origin, the Court must conclude that Plaintiff has established a strong trademark in "Ranch Style."

### b. As Applied to Defendants' Products

■ Having carefully considered the dictionary meaning of the word "ranch," Plaintiff's survey, Defendant's pre-release research projects, and the numerous recipes and cookbooks introduced by Defendants, the Court concludes that there is no descriptive meaning to the term "ranch style" as applied to dairy-based salad dressings in the mind of the typical consumer.

■ Defendants have pointed to the use by other salad dressing producers of the terms "ranch," "ranch style," and variations thereof. The Court, however, finds several reasons for discounting the significance of third-person use in this instance.

First, the primary third persons relied on by Defendants are Marzetti and its customer-producers—Kohl, Red Owl, and Giant Food. But the Marzetti group's dressing is not a dairy-based dressing like Defendants', but, rather, is tomato-based, sweet, and pungent. Thus, the Marzetti group might properly claim a descriptive use of the term "Ranch Style" as set forth in the third descriptive meaning found by this Court.

HVR's product, "Hidden Valley Ranch Salad Dressing," uses the producer's entire name to identify the product. HVR does not use the term "Ranch" as a flavor description, but, instead, has painstakingly avoided such use.

With two exceptions, the remaining third-person users distributed their salad dressings for only limited periods of time before being enjoined or voluntarily terminating distribution, or have changed the names of their products. The experience of the majority of those who ceased distribution, was that they found insufficient public acceptance of their "Ranch" or "Ranch Style" dressing.

Finally, and most importantly, the Court is of the opinion that all the producers of "Ranch" or "Ranch Style" salad dressings were attempting to pass off their product on the good will established by HVR in its mark and its salad dressing.

Prior to the entry of "Hidden Valley Ranch Salad Dressing" on the market, there was no consumer awareness of any connection between the word "ranch" and salad dressings. After the popularity of HVR's product began to rise dramatically, however, consumers began to identify the mark "Hidden Valley Ranch" with HVR's salad dressing mix as indicative of both origin and, since it was a unique product, description. Because of HVR's sudden popularity with its unique product, other salad dressing producers wanted to compete. But the competing producers found such truly descriptive terms as "Buttermilk Style" unacceptable to potential consumers. Accordingly, many of the producers decided that "Ranch" was a convenient flavor designation that was acceptable to consumers and that would allow the new producers to utilize the good will established by HVR in the unique flavor and texture of its product. But this Court can find no convincing evidence that the typical consumer, as opposed to the typical producer, has ever considered the word "ranch" to be descriptive of a flavor or a flavor-texture of salad dressing.[11]

### 2. Similarity of Design

■ There can be no doubt that Plaintiff's "Ranch Style" label design is distinctive in the food-packaging industry and that the combination of the term "Ranch Style" and the distinctive label is an extremely strong mark.

Defendants, on the other hand, use light, colorful labels and have their respective dry-salad-dressing-mix trademarks on the package.

But these design differences do not eliminate possible consumer confusion with regard to whether Plaintiff, as an origin, is somehow connected with Defendants' products by way of license, recipe, etc. To determine this issue, the Court must consider what overall impression the design and labelling would give a typical consumer.

■ The Court finds that a likelihood of confusion plainly exists with regard to Defendant General Foods's "Ranch Style" dressing mix. The Term "Ranch Style" predominates over all other aspects of the label, while the "Good Seasons" trademark is relatively unnoticeable. Moreover, the term "Ranch Style" is in a font which is not identical to, but strangely reminiscent of, Plaintiff's "Ranch Style" font.

Defendant Kraftco's labelling is much more successful in avoiding confusion than is General Foods's. The trademark "Great Beginnings" dominates the package and overshadows the use of the term "Ranch Style." The likelihood of confusion arises in Kraftco's dressing mixes because it uses the term "Ranch Style" in such a manner that the term cannot be construed to signify a flavor. "Ranch Style" is produced, in uniform capital letters of the same size as those of "Great Beginnings," between Kraftco's trademark and the actual flavor designation ("Traditional," "Real Blue Cheese," or "Toasted Onion"). While there is some doubt as to the likelihood of confusion with Kraftco's packaging the Court can see no other meaning for the term "Ranch Style" in the eyes of the typical consumer other than as signifying a connection with Plaintiff.

Both Defendants might have avoided likelihood of confusion by simply producing the word "style" in a different size or style of font from that of the word "ranch." That simple precaution, in conjunction with the different over-all label design, might well have avoided possible confusion. But by setting forth the word "style" as strongly and as significantly as they do the word "ranch," they emphasize the entire term "Ranch Style" and create the likelihood of

---

11. All of Defendants' pre-release projects and all of the recipes and cookbooks before this Court support such a finding. The only evidence out-of-line with this finding is the fact that a small percentage (9%) of the interviewers in Plaintiff's survey responded either "salad dressing" or "salad oil" to the questions relative to "Ranch Style." The Court concludes that many of these answers must have been based on origin-description confusion brought about by the uniqueness of HVR's product. *See James Burrough, supra,* 540 F.2d at 278.

confusion with Plaintiff's mark. The Court concludes that Defendants adopted their graphic treatment of the word "style" to aid in avoiding infringement actions by HVR.

### 3. Similarity of Products

All of Plaintiff's products are ready-to-serve canned food items. Defendants' products at issue are dry salad dressing mixes that are sold in foil packets.

Plaintiff has a stated quality-control policy of not producing items under the "Ranch Style" mark that may deteriorate on the shelf or may be improperly prepared by the consumer. Defendants argue that this policy insures that confusion will be avoided, and that, in any event, packets of dried mix are sufficiently different from canned items that consumers would not be confused.

▮ The issue of likelihood of confusion, however, must be considered on the basis of objective facts visible to the typical consumer and must be determined on the likelihood of what that consumer would conclude. The typical consumer could not be aware of Plaintiff's policy of producing only canned goods under the "Ranch Style" trademark. Though all of Plaintiff's existing Ranch Style products are canned, in light of the ever-expanding nature of Plaintiff's line of products, the Court concludes that the typical consumer would not distinguish the origin of the product on the basis canned as opposed to packaged grocery items. There is not such an overall difference in the items to avoid the likelihood of confusion.

### 4. Retail Outlets, Advertising Media, and Consumers

It is undisputed, and the Court so finds, that Plaintiff and both Defendants have marketed their respective "Ranch Style" products through the same channels of distribution into the same retail grocery stores and that the products were all eventually sold to the same type and group of consumer. The principal type of consumer for all these "Ranch Style" products is the young to middle-aged housewife of lower to upper-middle income economic status.

It is similarly undisputed, and the Court so finds, that Plaintiff and both Defendants used the same type of advertising in the same media—newspapers, magazines, and television—to promote their respective "Ranch Style" products.

### 5. Quality of the Products

Plaintiff exercises great care in controlling both the type and quality of the items it produces under its "Ranch Style" mark. The Court finds that Plaintiff has achieved consumer awareness of its high standards of quality control.

The Court has no reason to doubt the high quality asserted for Defendants' "Ranch Style" dressing mixes. But regardless of the quality of Defendants' products, Defendants' use of the "Ranch Style" mark has deprived Plaintiff of its ability to control the quality of products sold under its mark. This loss of control is especially relevant in the present case, where Plaintiff has an established policy of not producing items such as Defendants' dressing mixes under the "Ranch Style" mark to avoid any stigma that might be unfairly attached to the mark by consumer mishandling.

### 6. Motive and Intent

▮ The motive or intent of Defendants in entering into the use of the allegedly infringing mark is not determinative in deciding whether Plaintiff is entitled to protection. But it is a factor properly assessed in regard to determining the likelihood of confusion, and it is an essential element in an award ordering an accounting. *W. E. Bassett, supra,* 435 F.2d at 664; *Maier Brewing, supra,* 390 F.2d at 123–124; *Monsanto Chem. Co. v. Perfect Fit Prod. Mfg. Co.,* 349 F.2d 389, 391–397 (2d Cir. 1958); *Sterling Drug, Inc. v. Lincoln Laboratories, Inc.,* 322 F.2d 968, 973 (7th Cir. 1963); *Jewel Companies, supra,* 413 F.Supp. at 997 n. 1; *Chips 'n Twigs, supra,* 414 F.Supp. at 1019.

As previously discussed, the Court finds that Defendants adopted the term "Ranch

Style" for the purpose of trading off the good will established by HVR in its "Hidden Valley Ranch" mark. The Court also finds that Defendants proceeded to use the term "Ranch Style" despite their own in-house reports to the effect that "ranch style" was not descriptive of salad dressing and despite their awareness of Plaintiff's trademark.

Nevertheless, while recognizing Defendants' disregard of Plaintiff's trademark, the Court finds that Defendants did not adopt the term "Ranch Style" with the intent of utilizing the good will in Plaintiff's trademark to further their own sales or profits.

▮ In this regard, the Court notes that Plaintiff has a more-or-less regional distribution of its "Ranch Style" products, while the goal of both Defendants was to market their respective "Ranch Style" dressing mixes nationally. *Cf. Beef/Eater Restaurants, supra,* 398 F.2d at 640. Additionally, differences in product and label design, and particularly Defendants' use of their own respective trademarks in both their labeling and their advertising, while not sufficient to avoid the likelihood of confusion, are sufficient to negate the intent to utilize the good will established in Plaintiff's trademark to their own ends. *Ralston Purina, supra,* 341 F.Supp. at 135–136.

### 7. Actual Confusion and Damage

▮ The essential finding necessary for judicial protection of a trademark is the likelihood of confusion. It is well-established that it is not necessary to prove actual confusion on the part of consumers in order to establish the likelihood of confusion. *Beef/Eater Restaurants, supra,* 398 F.2d at 639; *American Foods, supra,* 312 F.2d at 624; *W. E. Bassett, supra,* 435 F.2d at 661–662; *Monsanto Chem., supra,* 349 F.2d at 392; *Metropolitan Life Ins., supra,* 277 F.2d at 900. The reason that proof of actual confusion or damage is not necessary for injunctive relief is because of the great difficulty inherent in establishing actual confusion. *Pure Foods, supra,* 214 F.2d at 797. Proof of actual confusion, is, however, an important consideration in determining

whether damages should be awarded. *Pure Foods, supra,* 214 F.2d at 797; *Monsanto Chem., supra,* 349 F.2d at 392; *Sterling Drug, supra,* 322 F.2d at 973.

▮ Proof of actual confusion is the best evidence of likelihood of confusion. Because of the difficulty in obtaining proof of actual confusion, any proof of actual confusion is significant in showing that the likelihood of confusion exists; statistical significance is not the relevant standard. *Kentucky Fried Chicken, supra,* 549 F.2d at 386; *Roto-Rooter, supra,* 513 F.2d at 45–46; *World Carpets, Inc. v. Dick Littrell's New World Carpet,* 438 F.2d 482, 489 (5th Cir. 1971). It also follows from the difficulty of establishing proof of actual confusion that the absence of such proof is not normally relevant to the issue of likelihood of confusion, although it may become relevant under certain factual situations. *American Foods, supra,* 312 F.2d at 624; *E. I. Dupont de Nemours, supra,* 393 F.Supp. at 513–514.

▮ Plaintiff's evidence of actual confusion is minimal at best. Nevertheless, the Court does place some significance on the fact that two professional grocers expressed some degree of confusion over Defendants' use of the term "Ranch Style." While the relevant area of confusion is that which is in the mind of the typical consumer, evidence that retailers were confused does support the likelihood of confusion in the mind of the consumer. *World Carpets, supra,* 438 F.2d at 489.

The Court does not find the fact that Plaintiff has been unable to produce any clear evidence of actual confusion to be of any significance in the present lawsuits. The products involved herein are quite inexpensive, and individual cases of actual confusion would not be so important to the consumer .as to motivate him to contact one of the parties. The Court is disappointed, however, that Plaintiff did not tailor its survey to reach the ultimate issue of confusion.

▮ The issue of actual economic damage to Plaintiff is interrelated with the issue of actual confusion. Like actual con-

fusion, there is no need to prove actual economic damage to detain judicial protection for a trademark, but actual damage is highly relevant to any award of damages. *Pure Foods, supra,* 214 F.2d at 797; *James Burrough,* 540 F.2d at 275; *Sterling Drug, supra,* 322 F.2d at 973; *Chips 'n Twigs, supra,* 414 F.Supp. at 1019.

■ The Court finds that Plaintiff has failed to establish any actual economic harm suffered by it, as an element of liability.

## 8. Unclean Hands

Defendants assert that Plaintiff should be denied all relief because it allegedly misused the registration symbol on its products for a limited period of time, and thus has "unclean hands." The Court finds this defense to be frivolous.

On 21 February 1970, through clerical oversight, Plaintiff's federal Registration No. 521,081 was not renewed for another twenty-year term. On 23 March 1971, thirteen months later, Plaintiff's federal Registration No. 910,457 was issued. In the interim, Plaintiff's federal Registration No. 726,319 was in full force and effect, as were seven state registrations.

■ Use of the registration symbol on specific products not included in a registration does not constitute unclean hands where the products in question are a natural expansion of the listed products on which use of the symbol is permitted under 15 U.S.C. § 1111. *Meditron Co. v. Meditronic, Inc.,* 137 U.S.P.Q. 157 (T.T.A.B.1963). In any event, misuse through clerical oversight does not constitute unclean hands where there is a colorable right to use of the symbol and where there is no evidence that the misuse was with the intent to deceive the public. *Elizabeth Arden Sales Corp. v. Faberge, Inc.,* 304 F.2d 891, 893, 49 CCPA 1191 (1962). *Cf. Fox-Stanley Photo Prod., Inc. v. Otaguro,* 339 F.Supp. 1293, 1295 (D.Mass.1972). Proof of "unclean hands" as a defense to a trademark infringement case must be strong. *John Wright, Inc. v. Casper Corp.,* 419 F.Supp. 292, 324 (E.D.Pa.1976).

## 9. Conclusion

■ Having considered all of the above-discussed factors, and having considered the overall impression created by Defendants' "Ranch Style" salad dressing mixes, the Court finds that there is a likelihood of confusion created by Defendants' use of the term "Ranch Style" with regard to Plaintiff's registered trademark. Accordingly, the Court concludes that Defendants have each infringed on Plaintiff's registered trademark by use of the term "Ranch Style" on their respective dry salad dressing mixes.

With regard to the intent or motive of Defendants, the Court finds that neither Defendant used the term "Ranch" with the specific intent of utilizing the good will built up by Plaintiff in the term "Ranch Style" to their own ends. The Court does find, however, that both Defendants intended by use of the term "Ranch Style" to utilize the good will built up by HVR in the mark "Hidden Valley Ranch." The Court further finds that both Defendants acted in disregard of Plaintiff's registered trademark, and that, with regard to Defendant General Foods, such disregard was blatant and callous.

## B. Common Law and Texas Trademark Infringement

Plaintiff's claims of Texas trademark infringement, under both 4 Tex.Bus. & Comm.Code Ann. § 16.26(a) and common law present no issues different from those covered in this Court's discussion of federal trademark infringement. Much of language of the Texas Trademark Act, as amended, 4 Tex.Bus. & Comm.Code Ann. ch. 16, and the corresponding Illinois statute on which it was modeled, is similar to or traces the federal Act. Pravel, *The New Trademark Act—Some Reasons and Background,* 6 S.Tex.L.J. 241, 245 (1962). The principal issue is, once again, likelihood of confusion.

This Court will, therefore, treat the claims of federal, state, and common law

infringement as raising the same issue. Having found infringement under federal law, the Court concludes that Defendants have also infringed on Plaintiff's "Ranch Style" trademark under 4 Tex.Bus. & Comm.Code Ann. § 16.26(a) and under the common law of the State of Texas.

### C. Unfair Competition

■ As stated in *James Burrough, supra,* 540 F.2d at 274 n. 16:

[Plaintiff's] claim for unfair competition and for trademark dilution are absorbed in a finding that trademark infringement, *i. e.,* a likelihood of confusion, deception, or mistake, exists. Trademark infringement is one form of unfair competition and the same set of facts support a suit for either. . . . A discussion of [Plaintiff's] claims for unfair competition and dilution is therefore unnecessary . . . .

(citations omitted). Thus, although unfair competition is a more broadly conceived tort than its offspring, trademark infringement, *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 413, 36 S.Ct. 357, 60 L.Ed. 713 (1916) and there are some circumstances where a defendant may be guilty of competing unfairly without having technically infringed, *Professional Golfers Ass'n of America v. Bankers Life & Cas. Co.,* 514 F.2d 665, 671 (5th Cir. 1975), having found trademark infringement, it is unnecessary for this Court to consider the broader tort, either under common law or under the Act, as amended, 15 U.S.C. § 1125(a). *American Heritage Life Ins., supra,* 494 F.2d at 14; *Norman M. Morris Co. v. Weinstein,* 466 F.2d 137, 141 (5th Cir. 1972).

### D. Trade Name Infringement

■ Similarly, trade name infringement is simply another specific instance of the general tort of unfair competition, based on considerations similar to those of trademark infringement. *American Plan Corp. v. State Loan & Finance Corp.,* 365 F.2d 635, 637 (3d Cir. 1966).

" . . . The major differences between the two with respect to the form and scope of relief, have been described as follows: "Trade-marks are protected in a suit for trade-mark infringement; trade names in an action to restrain passing off or unfair competition. A trade-mark must be affixed to the merchandise it is intended to identify; a trade name is not required to be physically attached either to the goods or packages. A trade-mark need not be so associated by the purchasing public with the article for which it is claimed as to acquire the 'secondary meaning' or 'secondary significance' demanded of trade names. A trade-mark is substantially copied, its use will be enjoined notwithstanding that it is accompanied by such distinguishing features as render it unlikely that the public will mistake the goods bearing the simulated mark for those stamped with the original. If a trade name is imitated, relief will be granted only if such confusion of the public is probable. The injunction against the imitation of a trade-mark is absolute, all use of the mark being prohibited; the injunction restraining simulation of a trade name is qualified or limited in scope, preventing only those uses of the mark which render it likely that the public will confuse the products bearing the marks."

The distinction is, however, gradually disappearing, and divorced from such archaic technicalities, the legal distinction now is consistent only with the linguistic distinction between trademark and trade name, the former being used in connection with a vendible commodity, the latter with the name of a business enterprise. A trade name distinctive enough to be used as a trademark or service mark is now registrable as such and treated in all other respects as a trademark.

3 Callman, *Unfair Competition, Trademarks, and Monopolies* § 66.1 at 22–24 (3d ed. 1969) (footnotes omitted).

■ Having found trademark infringement, and in light of the facts that Plaintiff markets products other than those labelled "Ranch Style" and that the Court does not necessarily find a *probability* of confusion

on the part of the public with regard to the origin of Defendants' "Ranch Style" salad dressing mixes, the Court is of the opinion that Plaintiff's action for infringement of trade name is at best duplicitous of its trademark infringement action, that it has not been proven as a separate action, and that it should, therefore, be dismissed.

### E. Relief

■ Where there is a likelihood of confusion over the origin of a subsequent user's products, the prior user is entitled to prohibitive injunctive relief against the use of his mark by the subsequent user, regardless of whether or not actual confusion, actual economic harm, or bad faith has been shown. Injunctive relief protects both the prior user from infringement of his established good will and corresponding trademark rights and the public from confusion in the marketplace. *Pure Foods, supra,* 214 F.2d at 797; *W. E. Bassett, supra,* 435 F.2d at 664; *Maier Brewing, supra,* 390 F.2d at 123–124; *Monsanto Chem., supra,* 349 F.2d at 392; *Sterling Drug, supra,* 322 F.2d at 973; *Chips 'n Twigs, supra,* 414 F.Supp. at 1019; *E. I. Dupont de Nemours, supra,* 393 F.Supp. at 522–523.

Because of lack of proof in the first stage of this lawsuit, the scope and timing of the injunctive relief must be determined at a later hearing. *See E. I. Dupont de Nemours, supra,* 393 F.Supp. at 528.

■ The traditional analysis of relief available to the user of an infringed trademark granted damages to the prior user only where there was evidence of actual confusion and actual economic harm. *See, e. g., Sterling Drug, supra,* 322 F.2d at 973. While the Court has found that there is no evidence that Plaintiff has suffered either of these in the present case, this case has been bifurcated and tried only on the issue of liability, not of damages. In such a case, the clear implication of the Ninth Circuit's holding in *Pachmayr Gun Works, Inc. v. Olin Mathieson Chem. Corp.,* 502 F.2d 802, 808–809 (9th Cir. 1974) is that Plaintiff should still be entitled to its day in court to attempt to prove up actual damages in the second phase of the lawsuit. This holding appears to this Court to be a sound rule.

■ In addition or as an alternative to actual damages, Plaintiff may be entitled to exemplary damages based on unjust enrichment or the need to deter a deliberate infringer. *W. E. Bassett, supra* 435 F.2d. at 664; *Maier Brewing, supra,* 390 F.2d at 123–124; *Monsanto Chem., supra,* 349 F.2d at 391–397. And although attorneys' fees cannot ordinarily be recovered in trademark infringement actions under the Act, *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967), such fees may still be occasionally recovered under the associated state and common law actions.

The present actions present an unusual situation with regard to exemplary damages and attorneys' fees. Normally for these to be recoverable, there must be a finding of fraud under common law unfair competition, by which is meant a deliberate attempt on the part of a defendant to utilize the good will established in a mark by a plaintiff. In the present actions, Defendants were deliberately attempting to trade off of the good will established by a third-person, HVR. Defendants did, however, proceed to use the "Ranch Style" mark with full knowledge and in disregard for Plaintiff's mark. At least with regard to Defendant General Foods, such action amounted to a callous disregard of Plaintiff's trademark rights. This situation is accentuated by the fact that both Defendants are large businesses that distribute nationally, while Plaintiff is a more-or-less regional distributor. *See* the general discussion and many citations in 4 Callman, *Unfair Competition, Trademarks, and Monopolies* §§ 89.-1(b)(2) & 89.3(d) (3d ed. 1970 & Supp.1976). *See also Pachmayer Gun, supra,* 502 F.2d at 809–813.

The Court will expect the parties to discuss all of these issues along with the advisability of continuing consolidation at future hearings on possible damages and scope of relief.

586

## IV. CONCLUSIONS [12]

(1) The Court has jurisdiction over these causes of action under § 39 of the Act, 15 U.S.C. § 1121, under 28 U.S.C. §§ 1331, 1332, & 1338.

(2) Plaintiff Great Western is a wholly-owned subsidiary of its parent corporation, Plaintiff Waples-Platter. Use of the trademark "Ranch Style" by Plaintiff Great Western inures to the benefit of Plaintiff Waples-Platter.

(3) The term "Ranch Style," is descriptive as applied to Plaintiff's "Ranch Style Beans" product.

(4) The term "Ranch Style" is not descriptive, but is at most merely suggestive, when applied to Plaintiff's other "Ranch Style" products.

(5) Plaintiff has established a secondary meaning in its trademark "Ranch Style," so as to correctly create the impression in the mind of the typical consumer of retail grocery items that all its "Ranch Style" products have the same origin.

(6) Plaintiff has established a strong trademark in the term "Ranch Style."

(7) The term "Ranch Style" has no descriptive meaning in the mind of the typical consumer as applied to dairy-based salad dressings.

(8) Several manufacturers, including Defendants, have used the terms "ranch," "ranch style," and variations thereof on different types of salad dressings, in an attempt to utilize the good will established by HVR in its "Hidden Valley Ranch" salad dressings, and thus sell their own products. The Court, however, finds that the terms "ranch" and "ranch style" have never been accepted by the consuming public as descriptive of a dairy-based salad dressing, and do not signify such a type of salad dressing to the typical consumer.

(9) Plaintiff's "Ranch Style" label design is distinctive in the food-packaging industry and the combination of that label design with the term "Ranch Style" constitutes an extremely strong mark.

(10) On a side-by-side comparison, Defendants' "Ranch Style" labels are considerably different from Plaintiff's "Ranch Style" label. Defendants' labels, however, both use the term "Ranch Style" in a predominant manner, setting forth the word "style" as strongly and in the same manner as the word "ranch." In light of the strength of Plaintiff's trademark in the term "Ranch Style," the Court finds that there is a likelihood of confusion on the part of the typical consumer with regard to whether Plaintiff, as an origin, is somehow connected with Defendants' products by way of license, recipe, etc., despite other differences in labeling. The "Ranch Style" label of Defendant General Foods is more prone to create confusion in the mind of the typical consumer than is that of Defendant Kraftco.

(11) While Plaintiff's "Ranch Style" products are all canned food items, and those of Defendants are dry salad dressing mixes sold in foil packets, the Court finds that the products are not so dissimilar as to avoid the likelihood of confusion. In reaching this conclusion, the Court has considered the fact that all these products are sold in the same retail grocery outlets to essentially the same typical consumer.

(12) Plaintiff and both Defendants have marketed their respective "Ranch Style" products through the same channels of distribution into the same retail grocery stores and have ultimately sold them to the same type and group of consumer. The principal type of consumer for these "Ranch Style" products is the young to middle-aged housewife of lower to upper-middle income economic status.

(13) Plaintiff and both Defendants use the same type of advertising in the same media to promote their respective "Ranch Style" products.

(14) The motive and intent of Defendants in adopting the term "Ranch Style" for their products was to utilize the good will established by HVR in its "Hidden Valley Ranch" mark. Defendants proceeded to

---

12. See Note 1, *supra*.

use the term "Ranch Style" despite their own in-house reports to the effect that "ranch style" was not descriptive of salad dressing and their full awareness of Plaintiff's trademark in the term "Ranch Style." The Court finds, however, that Defendants did not adopt the term "Ranch Style" with the intent of utilizing the good will in Plaintiff's trademark to further their own sells or profits.

(15) Plaintiff's evidence of actual confusion is minimal at best. Nevertheless, the Court does find significant the fact that two professional grocers expressed some degree of confusion over Defendants' use of the term "Ranch Style." The Court does not find the fact that Plaintiff has been able to produce any clear evidence of actual confusion to be of any significance to the issue of likelihood of confusion.

(16) The Court finds that Plaintiff has failed to establish any actual economic harm suffered by it because of Defendants' use of the term "Ranch Style."

(17) The Court finds Defendants' defense of "unclean hands" on the part of Plaintiff to be frivolous and without merit.

(18) There is a likelihood of confusion on the part of the typical consumer as to whether Plaintiff is an origin of Defendants' "Ranch Style" products.

(19) Defendants have each infringed on Plaintiff's registered trademark under 15 U.S.C. § 1114(1)(a) by their use of the term "Ranch Style" on their respective dry salad dressing mixes.

(20) Defendants have also infringed on Plaintiff's "Ranch Style" trademark under 4 Tex.Bus. & Comm.Code Ann. § 16.26(a) and under the common law of the State of Texas.

(21) Having found trademark infringement, the Court does not find it necessary to consider the broader tort of unfair competition.

(22) Having found trademark infringement, the Court finds that Plaintiff's action for trade name infringement is at best duplicitous of its trademark infringement action, that it has not been proven as a separate action, and that it should, therefore, be dismissed.

(23) The Court will shortly enter an order setting a time for a conference between counsel for all parties and the Court on the remaining issues to be determined in these actions, which include: the scope of injunctive relief to be granted, any issues of mootness, actual damages, exemplary or unjust enrichment damages, attorneys' fees, issues of possible bad faith, and the adviseability of continuing consolidation of these actions.